[Crim. No. 4751. In Bank. Feb. 11, 1947.]

THE PEOPLE, Respondent, v. ERNEST N. DUNN,
Appellant.

John W. Ross, Jr., for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, John Quincy Brown, District Attorney, and Albert H. Mundt, Chief Deputy District Attorney, for Respondent.

SHENK, J.—Defendant appeals from a judgment of conviction of first degree murder imposing the extreme penalty, and from an order denying a new trial. His brief lists four points for reversal. One challenges the correctness of the instructions as a whole. Two concern alleged errors in the admission of testimony. The fourth questions the sufficiency of the showing of premeditation. The facts are established for the most part without contradiction by the testimony of eyewitnesses to the killing and by the circumstances immediately preceding and subsequent to that event.

Defendant and the deceased, Kathryn Way, were married in Arizona in 1936. Kathryn was then sixteen years of age. Defendant was twenty-eight and had two sons by a prior marriage, which may or may not have been dissolved. Defendant was an itinerant worker. Within a few months he and Kathryn separated, became reconciled, and again separated. Kathryn then obtained a dissolution of the marriage, either by an annulment because of her minority or by divorce.

Thereafter, Kathryn entered into two marriages, the first in 1940, terminated by divorce in 1944, and the second in March, 1945, terminated by an annulment in December, 1945. Meanwhile she and defendant maintained an intermittent correspondence. A reconciliation without remarriage was effected in June, 1945, when Kathryn, against the wishes of her family, left her parents' home in Sacramento, and went to live with defendant in another community. Two or three months later the couple returned to Sacramento, and in November, 1945, moved into an apartment rented from a Mrs. Eliot.

While they were residing in the apartment, and on the night of March 3, 1946, after their return from a family picnic, a serious quarrel took place. Defendant admits that on that night he accomplished an act of sexual intercourse with

Kathryn against her will. He used a physical force which left marks upon her throat observable by others the next day. On the morning of that day, March 4th, Kathryn arrived at the home of her parents soon after 8 o'clock. Accompanied by her mother she went to the police station and requested an escort while she obtained her clothes and other possessions from the apartment. This was refused, so she enlisted the aid of her brother and an uncle. When the defendant returned from work he found that Kathryn had moved out, taking most of her possessions with her. Thereafter, she resided with members of her family.

Between March 4th and March 18th, the date of the homicide, defendant was persistent in his efforts to intercept Kathryn. He knew that, accompanied by her sister-in-law, she customarily conveyed her father and brother to work in the morning and returned for them shortly before the close of the working day. On six or seven occasions the defendant approached the car in which Kathryn was sitting, engaged her in conversation, and asked her to return to him. Whenever Kathryn saw him approaching she followed the practice of rolling up the car window to within a short space from the top and locking the door on her side of the car. She repeatedly told the defendant that there was no possibility of a reconciliation. On March 10th, she wrote him to the same effect.

The defendant was working the night shift at a gasoline station. His employer had shown him a .25 caliber Colt automatic pistol which, for the protection of the station, was kept loaded in the locker room. On March 16th, the defendant asked a customer, Deputy Sheriff Bonetti, to secure enough shells to fill the clip. Bonetti told defendant he could not obtain additional shells. He examined the gun at that time and saw that there were four cartridges in the magazine and one in the chamber. Subsequently, the defendant found on the seat of his employer's car a sufficient number of cartridges to fill the gun. He then began to take it home with him when he went off duty.

The defendant knew that in the daytime Kathryn was taking care of the eighteen-months-old baby of Dr. and Mrs. Hubbard. On his way to work on the evening of March 16th, he called at the Hubbard home and talked of his desire to have Kathryn return to him. On March 17th, defendant's employer noticed that the pistol was missing and when de-

fendant came to work at 9 that night, he asked defendant about it. When defendant said he had the gun, the employer told him to get a permit in the morning to carry a weapon, as he did not even want him to have it on the station lot without a permit.

Defendant's shift ended about seven the next morning, Monday, March 18th. He went to his apartment, still carrying the gun. He saw his landlady and told her he would pay his rent after he slept. About fifteen minutes later he tried to get a drink at a saloon across the street, but was refused service before eight o'clock. He then went to the Hubbard home but found that Kathryn had already called for the baby. He returned to the saloon and consumed two double "shots" of whiskey and two bottles of beer. He next drove to the home of Kathryn's parents and talked about her to her younger brother. While driving back to town, he saw Kathryn driving toward him, with her sister-in-law and the baby as passengers in the car. He signalled them to stop. Kathryn withdrew off to the side of the road, rolled up the car window, and locked the left-hand door.

Defendant approached her and asked Kathryn to roll down the window so he might talk to her. Then by the stratagem of pretending to borrow a cigarette, he persuaded her to lower the window to a point which permitted him to reach in and unlock the door. He asked her if she would come out or if he would have to kill her in the car. Then without giving her time to make an election, he fired three shots, two of which struck her temple and the other her hand. As the sister-in-law and baby crouched in the car, defendant dragged the stricken woman to the middle of the road and beat her about the face.

Meanwhile the sister-in-law locked the car doors and refused to permit defendant to put Kathryn in the rear seat. Telling him to take Kathryn to a hospital, she drove off and caused the authorities to be notified. At this point one Heaton approached in a truck and suggested calling an ambulance. Defendant said his wife had fallen out of the car and asked assistance in putting her into the rear seat. Heaton's observation of the condition of Kathryn and of the car aroused his suspicions. As defendant drove off towards Sacramento, Heaton followed him. Apparently noting that he was being followed, defendant drove to the Sacramento Emergency Hospital, but instead of stopping, he drove over the ramp and out.

Heaton tried to follow but lost sight of him. Defendant stopped and surrendered the key of the apartment to the landlady, stating that he had shot his wife.

His movements during the next hour are not definitely accounted for, but physical evidence indicates that during that period he took a wrench from his tool kit and beat the dying woman about her private parts. He appeared at his place of work about 10:15, stated he had just shot his wife, and surrendered the pistol. He then inquired about the nearest hospital, and drove away. Shortly thereafter he stopped at another service station where he had previously worked, said that his wife had been run over, and asked that an ambulance be called. At this point the police caught up with him, and he was taken into custody. Kathryn was taken to the hospital but passed away within five minutes after her arrival. Death was caused mainly by the gunshot wounds at the base of her skull.

Defendant admitted what he had done to the police captain, deputy sheriff, and chief deputy district attorney. He stated that his wife had been unfaithful to him and had caused him a lot of trouble. On taking the witness stand in his own behalf he claimed that he could not remember anything about the events immediately surrounding the killing. The jury returned a verdict finding him guilty of murder in the first degree and expressly fixed the penalty at death. A verdict was also returned finding him to have been sane at the time of the homicide.

Defendant's assertion that the evidence shows that at the time of the shooting he was acting without premeditation or malice aforethought is contrary to the facts. The evidence shows a premeditated, deliberate, and cruel killing. It shows without contradiction that defendant annoyed and harassed his victim, tracked her down, and shot her in cold blood. There is no evidence that he was intoxicated or showed any sign of intoxication by reason of the liquor which he consumed shortly before the shooting. Intoxication is not urged expressly in extenuation. Even if urged by indirection it is sufficient to reiterate the recent statement of this court in *People* v. *Honeycutt, ante,* pp. 52, 62 [172 P.2d. 698], that "the question as to the effect of defendant's intoxication, if any, was for the jury and they, adequately instructed [as also in the present case] on the subject, impliedly found against defendant's contention. It may be noted, in

this connection, that the evidence is ample to support a finding that, in the hour before the killing, the defendant deliberately resorted to the use of intoxicants with the object of dulling any compunctions he thought might otherwise hamper him in carrying out the plan he had formed.''

 Without argument, or quotation from, or identification of any instruction objected to, defendant challenges generally the instructions as a whole on the ground that they failed to advise the jury of the distinction between murder of the first degree, murder of the second degree, and manslaughter, and failed to conform to the law as laid down in recent cases (*People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]).

An examination of the instructions shows that they were carefully prepared to meet the requirements emphasized in the cited cases. They contain the specific elements omitted in instructions which were the subject of criticism in the original opinion of this court in *People* v. *Heslen,* 163 P.2d 21 (see *People* v. *Heslen,* 27 Cal.2d 520 [165 P.2d 250]). Certain instructions follow verbatim an instruction suggested in *People* v. *Bender,* 27 Cal.2d 164, 184-185 [163 P.2d 8], quoted from *People* v. *Thomas, supra,* 25 Cal.2d at page 900. The words ''deliberate'' and ''premeditate'' are defined as this court defined them in the Bender case at page 183. The instructions also contain language of a type expressly approved in *People* v. *Honeycutt, supra, ante,* page 61.

A review of the charge as a whole indicates that no instruction was given of the character condemned in the cited cases. Moreover, if any instructions could be subject to criticism, the error would not be prejudicial under the facts disclosed by the record.

 There was no error in the admission in evidence of a photograph taken after the homicide which showed the condition of the face and chest of Kathryn as a result of the attack. Defendant asserts that the picture was admissible solely for purposes of identification, and that since there was no question as to the identity of the deceased, the only purpose of the exhibit was to prejudice the jury. The prosecution was not required, merely because identification was unquestioned, to withhold cumulative and corroborative evidence otherwise admissible. Defendant was permitted to introduce everything which he felt might tend to favor his cause with

the jury, and the prosecution could not rightly be excluded from showing the details of the crime merely because they might have a tendency to influence the jury against the defendant. (*People* v. *Lisenba,* 14 Cal.2d 403, 412 [94 P.2d 569] ; *People* v. *Goodwin,* 9 Cal.2d 711, 714 [72 P.2d 551], and cases there cited; *People* v. *Bannon,* 59 Cal.App. 50, 56 [209 P. 1029] ; Code Civ. Proc., § 1954.)

Defendant contends that the court erred in permitting the testimony of Mrs. Laura Hubbard given at a former trial to be read in evidence thereby depriving him of his right of cross-examination at the present trial. Mrs. Hubbard's testimony at the former trial, including examination and cross-examination, was concluded on May 29, 1946. She had informed the district attorney that as soon as her husband, Dr. Hubbard, was discharged from the Army she intended to go with him to Baltimore. Dr. Hubbard was discharged during the former trial but waited over with Mrs. Hubbard for its conclusion. A mistrial was declared about 10:30 o'clock of the morning of June 5th. About 12:30 on that day a representative of the district attorney called to serve a subpoena on Mrs. Hubbard to insure her presence at the next trial. He did not find her at home, and had a similar experience when he called again in the evening. The next morning, June 6th, when he made a third call, he was informed that the Hubbards had departed for the East earlier in the day.

It is provided in section 686 of the Penal Code (as amended, Stats. 1911, p. 364) that the defendant in a criminal action is entitled "to be confronted with the witnesses against him, in the presence of the court." But it is also there provided that where it is satisfactorily shown to the court that a witness is "out of [the] jurisdiction" or "cannot with due diligence, be found within the state," and that such witness has been cross-examined in the presence of the defendant at the former trial either by him or by his counsel the testimony of that witness may be admitted in evidence at a subsequent trial. Here the examination and cross-examination of Mrs. Hubbard on the former trial satisfied the constitutional and statutory requirements (*People* v. *Schwarz,* 78 Cal.App. 561, 578-580 [248 P. 990] ; *People* v. *Wilson,* 26 Cal.App. 336 [146 P. 1048] ; 79 A.L.R. 1392, 1411; see *People* v. *Clark,* 151 Cal. 200 [90 P. 549] ; *People* v. *Sierp,* 116 Cal. 249 [48 P. 88] ). The question whether due diligence was shown in attempting to secure her appearance at the subsequent trial

was addressed to the sound discretion of the trial judge. (*People* v. *Collup,* 27 Cal.2d 829, 836 [167 P.2d 714] ; *People* v. *Day,* 219 Cal. 562 [27 P.2d 909] ; *People* v. *Barker,* 144 Cal. 705 [78 P. 266] ; *People* v. *Reilly,* 106 Cal. 648 [40 P. 13] ; 122 A.L.R. 425, 439.) No abuse of discretion has been shown.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied March 10, 1947.