299 P.2d 353]

[Crim. No. 1109.   Fourth Dist.   July 9, 1956.]

THE PEOPLE, Respondent, v. LINCOLN TOBIN,
Appellant.

Edgar C. Keller, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of one Perry Peck on or about June 24, 1955, it being further charged that he was at the time armed with a deadly weapon, to wit, a meat cleaver. Shortly before the conclusion of the case the information was amended by striking out the words "a meat cleaver" and inserting the words "a knife having a blade longer than five inches." A jury found him guilty of murder in the second degree, and also

found that he was armed with a deadly weapon. He has appealed from the judgment and from an order denying his motion for a new trial. He has been most ably represented at the trial and on this appeal, by the same attorney who was appointed by the courts.

At 6 a. m. on June 25, an officer observed the body of Peck, while on a routine patrol in his squad car. The body lay two feet away from a bush, about 30 yards from a street intersection in the outskirts of Needles, and near the edge of an "old ball park" which was used for Little League practice. The area was one in which there were many bushes, and it was regularly patrolled by the officers. The body was also about 20 feet from a path which led across the area to an Indian camp, about three quarters of a mile away. It was not unusual for Indians to be seen lying under bushes in this area, either because they were asleep or because they were drunk. There were a number of bushes between the body and one of these streets. The deceased appeared to have been severely beaten about the head and face, his hair and face were matted with blood, and there was blood on his shirt and trousers. The deceased was barefooted, with his shoes partially underneath his body, and there were footprints indicating that he had walked to that point before taking off his shoes. There were no other fresh footprints, and no marks indicating that the body had been dragged to that location. The officer who discovered the body had last patrolled the area at 3 a. m., at which time he had not seen the body. He explained that he would not then have seen it, had it been there, because he was then approaching from the opposite direction and his lights "couldn't have hit him for the brush when I was traveling north."

The officer recognized the body as that of Perry Peck. Peck was an Indian, as is the defendant. The officers went to the Indian village where they found a man who identified the deceased, and also found a man who gave them information as a result of which they went to a home in Needles, about four blocks from the place where the body was found, arriving there about 7:30 a. m. They there found the defendant and John Harrison, another Indian, in the back yard. Before the officers could ask any questions the defendant told them that Peck had ripped the screen in the back door, gone in and stolen a jug of wine from him; that he had caught Peck and given him a good beating; and that he had also hit Harrison with a cleaver before beating Peck. Officers took

the defendant and Harrison to the police station and interviewed them. The defendant stated that the owner of this house, who had gone away, had brought him there on June 20 to paint the house and clean the place up; that the owner stated that Peck might help him with the work; that the only way he could get any work out of Peck was to give him wine; that on the morning of June 24 the defendant, Peck and another Indian were drinking wine and the defendant twice sent Peck to purchase wine; that about noon he went into the house, put a jug of wine in the icebox, and then went to sleep; that about 2 p. m. he awoke and found the jug was missing; that he became angered and rushed out of the house with the meat cleaver; that he saw Harrison sitting there and ''just hauled off and hit him up alongside of his face with the cleaver''; and that he then struck Peck and ''beat the hell out of him.'' When an officer told the defendant that Peck was dead, the defendant said ''I don't care about him dying he wasn't any good anyway.'' After this conversation the appellant was booked and incarcerated.

After this interview the officers took Harrison back to the house and he showed them where he and Peck were at the time of the beating. They found a blood-stained rug in the back yard which Harrison pointed out as the one on which Peck was lying when he was beaten by the appellant, and found a cleaver in the kitchen which Harrison identified as the one with which he had been struck. They took the cleaver and the rug to the station.

On June 28, the defendant was interviewed by the police chief and a deputy district attorney, with a reporter present. The defendant stated that it was about 2 or 3 o'clock on June 24 when he awoke and found his wine gone; that ''it could be later''; that he did not know how much later it could have been ''because when I went in I went to work and worked about a half-hour, maybe an hour, and got my supper''; that when he found his wine gone and the screen door cut he got mad and went outside; that he had nothing in his hand; that he accused Harrison and Peck of stealing his wine; that he hit Harrison with his fist; that Peck was lying down and he went over and hit him as he was getting up; that he had never seen this meat cleaver; that he told Peck never to come around again, and Peck took off and he did not know where he went; and that ''I was so dam mad I went in the house and fixed that door.''

Harrison testified that he was sitting in the back yard, and

that Peck was lying on his back; that the defendant came out of the house and said somebody "stole his jug of wine while he was sleeping"; that the defendant went in the house and came back out, and "he hit me on the face with it, that meat cleaver"; that the defendant then went over to where Peck was lying, told him to get up and hit him on the face twice with the meat cleaver; that Peck was helpless and "didn't fight or anything"; that he (Harrison) was bleeding from his nose and face, and he walked away; that the last thing he saw was the defendant hitting Peck; that he "slapped him two times"; and that "I left then."

An autopsy was performed about 4 p. m. on June 25. The autopsy surgeon testified that the deceased was middle-aged, that the left side of his face and lips were bruised and swollen; that across his abdomen were two inflamed bruises, each about an inch wide and 6 inches long; that there were three similar bruises across his right leg, between the knee and hip; that there were tears in the walls of the stomach directly under the two bruises on the abdomen; that these tears were each around 2 to 3 inches long; that there was considerable hemorrhage directly under the two bruises but no hemorrhage elsewhere, and about a quart of blood in the abdominal cavity; that because of the hemorrhage and the tears in the wall the two blows across the abdomen were evidently applied with very severe force; that the actual cause of death "was the rupture of the stomach and consequent hemorrhage," plus such contribution as the shock from other injuries may have made; that a blow on the front of the abdomen could press the stomach against the spine and cause such a rupture; and that this would more easily happen if the stomach was empty, and might happen if the blow was severe enough whether it was empty or not. The doctor stated that death would not be instantaneous and that the abdominal hemorrhage occurred over quite a considerable period of time; that the lacerations in the wall of the stomach would rupture a number of small blood vessels "and the hemorrhage would be over quite a considerable length of time"; that if one of the larger blood vessels were cut death would come quickly; that the deceased could have walked 6½ blocks or a mile and a half; that the blows on the abdomen were produced by an instrument with a flat edge, whose surface could have been from a half inch to nearly an inch in width; that had a sharp edge been used instead of a flat edge the skin would have been lacerated; that the injuries on the leg appear to have been

applied by the same instrument; that the blows could not have resulted from a striking with a fist or hand; that "the flat surface where it struck" could have been from one half inch to an inch wide; that the surface that was applied to the skin here was less than an inch wide; and in reply to a question by defense counsel as to whether these bruises could have been made with a 2 x 4 stick, the doctor replied "If it hit on a corner edgeways" it might produce such an injury.

On the stand the defendant testified that on the morning of June 24, he and Peck did some work around the place and also consumed some wine; that in the early afternoon he gave Peck some money to buy a half gallon of wine; that when Peck returned he gave Peck a drink and put the wine in the icebox; that he locked the screen door and went to sleep; that he awoke about 2 or 3 p. m. and found there was no wine in the icebox and that the screen door had been cut; that he was mad because someone had broken into the house of which he was in charge; that he grabbed the meat cleaver but not with the intention of using it; that he went outside, saw Peck and Harrison, and accused them of stealing his wine; that he slapped Harrison on the side of the face with the meat cleaver; that Peck started to get up and appellant "busted him one, I hit him on the nose, and the blood just flowed"; that appellant used his fist and Peck went down; that Peck started to get up again and appellant slapped him a couple of times on the cheek with the cleaver; that he then told Peck to "get the heck out of there because he was no good"; that Peck staggered, with his hand to his bleeding nose, and left; and that he did not intend to kill Peck or hurt him badly, he just wanted to run him off the place. When asked whether he thought he had killed Peck he replied: "Well, I don't know about that." When asked whether he recalled hitting Peck more than twice with the cleaver, he replied "I don't know about that because I was pretty mad, you know." When asked whether or not he had hit Peck in the stomach with the cleaver, he replied "I don't know about that, I wouldn't say yes or I wouldn't say no." He then volunteered "I don't remember whether I wiped it off or cleaned it off either." He further testified that the meat cleaver introduced in evidence was the one with which he had hit Harrison and Peck, and that in hitting them he had used the flat side. He also stated that he was not telling the truth when he told the officers, a few days after his arrest, that he had never seen or used the cleaver; and that he was confused

and sick that morning and did not want to admit it at that time.

It is first contended that the evidence was not sufficient to show that the appellant caused the death of the deceased. It is argued that the evidence that Peck died as a result of blows struck by the appellant is purely circumstantial; that a conviction on circumstantial evidence alone must be based on circumstances which are not only consistent with guilt but irreconcilable with any other conclusion; that Peck must have died within a few hours at most after he was struck in the stomach; that he was struck by the appellant at 2 p. m. and it is obvious that he could not have been lying at the place he was found for any appreciable time during the daylight hours of June 24, or he would have been seen; that it is highly improbable that the blows struck by the appellant were the fatal blows; that a more reasonable theory is that Peck went to the area where he was found sometime during that evening or night, and there became involved in another brawl with another drunken Indian during which he was struck in the stomach with a stick or rod, or other instrument one half inch to one inch in thickness, which caused his death from hemorrhaging shortly afterwards; that this other theory is supported by the testimony of the autopsy surgeon to the effect that the blows to the stomach were inflicted by an instrument the plane of which was from one-half inch to one inch wide; that the surgeon's evidence is incompatible with the theory of guilt; and that the inferences pointing to guilt are less logical than the inferences pointing to innocence.

The evidence is not entirely circumstantial and some of the direct evidence, including his own admissions, justifies the inference that Peck died as the result of blows struck by the appellant. It appears from the appellant's testimony that his attack upon the deceased may have occurred much later than 2 p. m., and from the surgeon's testimony that death may have occurred a considerable time after the blows on the abdomen were received, during which time Peck could have walked a very considerable distance. He may have wandered about for a considerable time in the general area before arriving at the point where he died. There is no evidence that anyone else was in that area during the time in question, and none to indicate that the body would have been seen had anyone walked along the path or these streets after dark. The theory that the deceased was later engaged in

another brawl in which he received the fatal blows is supported by no evidence, and is not a reasonable conclusion which may be drawn from the evidence received. Under the evidence it cannot be said that the inferences pointing to guilt are less logical than those pointing to innocence. The testimony of the autopsy surgeon is not incompatible with the theory of guilt. While the doctor testified that the plane of the instrument which struck the deceased was from a half inch to an inch wide, he also testified that the only determination which could actually be made was that the surface of the object which had been applied was less than an inch wide; and that the bruises on the abdomen could have been made by a 2 x 4 stick if it hit on a corner edgeways. It would seem equally obvious that these bruises might have been caused by such an instrument as the meat cleaver here involved "if it hit on a corner edgeways"; and that the width of the bruises did not necessarily indicate the total width of the instrument used. If the flat side of the cleaver was applied with equal force on all parts of its area it would, of course, make a wider bruise than here appears. However, in slapping with the flat side of the cleaver, it would be natural for the heavier edge to strike the body with greater force than the thinner edge, and if the blade was tilted the thinner edge would not strike the body at all. This is the more probable here because of the rounded contour of the abdomen, as shown in the picture in evidence. ▮ It is necessary only to establish guilt beyond a reasonable doubt, and not beyond any possible doubt. ▮ The evidence as a whole sufficiently shows that the appellant caused the death of Peck, and is sufficient to support the verdict.

It is next contended that there was no sufficient evidence of malice aforethought to justify a verdict of guilty of murder. It is argued that the evidence not only shows there was no intent to kill but affirmatively shows an intent not to kill, and not to seriously injure Peck, since the appellant did not strike Peck with the cutting edge of the cleaver; that no guilty knowledge that the injury to Peck might result appears because the appellant told everyone about beating up Peck and did not flee; and that it is obvious that Tobin had no knowledge that his acts would endanger Peck's life. These are questions of fact, and the question of malice was one for the jury. The implied finding is amply supported by the evidence of the nature and circumstances of the attack, the

weapon used, and appellant's admissions with respect to many matters material in that connection.

It is next contended that the court committed prejudicial error by admitting into evidence the meat cleaver which the officers found on the premises after the appellant was incarcerated. It is argued that the cleaver was obtained by an unlawful search and seizure; that the appellant was arrested at the police station and not at the house, and the search was not incidental to an arrest or contemporaneous therewith; and that the appellant did not consent to this search. The constitutional prohibition runs only against unreasonable searches and seizures and it seems highly technical, in view of all of the evidence received in this connection, to assume that this constitutional provision was violated by the officers' going in and picking up this cleaver when they went back and locked up the house as they had told the appellant they would do. It is unnecessary to decide that question however, since no prejudice to the appellant appears. There was ample other evidence that the deceased was struck with the meat cleaver, including the admissions of the appellant. The cleaver was not only referred to many times in the testimony but it is an article the appearance of which would be well known to any juror, and it is something which is commonly found in the average home. Assuming that this cleaver itself was inadmissible, the other evidence with respect to its use was amply sufficient and it cannot be said that any possible prejudice to the appellant resulted from its admission.

It is next contended that the court erred in admitting into evidence two photographs showing the face of the deceased as he lay where he was found. These were objected to as being repetitious and irrelevant, and it is argued that other photographs introduced without objection sufficiently show the position of the decedent's body and the bruises on the abdomen which caused death; and that the two photographs objected to served no purpose other than to appeal to the passion of the jury. The autopsy surgeon testified that death was contributed to by shock in which the blows to the face played a part, and no prejudicial error appears. (*People* v. *Dunn*, 29 Cal.2d 654 [177 P.2d 553].)

It is next contended that the court erred in refusing to give appellant's requested instruction on justifiable homicide and self-defense. It is argued that there was evidence that the appellant did not strike to kill and purposely tried

to avoid seriously injuring Peck, that he was merely trying to drive Peck away, and that this evidence was sufficient to require that instructions be given "relative to justifiable homicide in defense of home and property." There was no evidence of any hostile act on the part of the deceased toward the appellant during the time in question, or anything indicating that the deceased was attempting to enter the house or that he was offering violence to anyone. The instructions being inapplicable under the evidence, were properly refused.

It is next contended that the court erred in denying appellant's motion for advised verdicts in the presence of the jury. No objection was made at the time and no prejudice appears. The court instructed the jury not to be biased against the appellant because he had been brought to trial, and that the jury was to be governed solely by the evidence in the case and the law as stated by the judge.

The final contentions are that the evidence was not sufficient to support the finding that the appellant was armed with a deadly weapon, and that the court erred in allowing the information to be amended after the close of argument by changing the words "a meat cleaver" to the words "a knife, having a blade longer than five inches." It is argued that a meat cleaver does not come within the definition of a deadly weapon, as found in section 3024 of the Penal Code; that there is some doubt as to whether it comes within the definition of the word "knife"; and that the court erred in permitting the information to be amended in this regard. The information was amended by interlineation. The amendment did not change the nature of the charge, or affect the substantial rights of the appellant. The cleaver in question had a handle and a long steel blade containing a cutting edge and it was, at least impliedly, conceded to be longer than five inches. Webster's New International Dictionary initially defines the word "knife" as an instrument consisting of a thin blade, generally of steel, having a sharp edge for cutting, and fastened to a handle. In 23 Words and Phrases, 559, authority is cited for the proposition that the word "knife" is a generic term including within its purview any instrument consisting of a thin blade of steel and having a sharp edge for cutting, connected to a handle. As so defined, this cleaver could properly be termed a knife. Moreover, it may be considered a metal "bar . . . used or intended to be used as a club," within the meaning of section 3024. Under the evidence it would be unreasonable to hold that the jury was

not justified in finding that the appellant was armed with a deadly weapon.

While many technical arguments are raised and argued with great skill the evidence is sufficient to support the verdict of guilt, and we are far from convinced that a miscarriage of justice has occurred.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied July 20, 1956, and appellant's petition for a hearing by the Supreme Court was denied August 8, 1956.