[Crim. No. 13818. In Bank. Mar. 12, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ORBRY LEE WILLIAMS, Defendant and Appellant.

**COUNSEL**

Molly H. Minudri, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, Philip C. Griffin and Daniel W. Mc-Govern, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**THE COURT.**—A jury found defendant guilty of one count of first degree murder and four counts of first degree robbery. His codefendant, William B. Thomason, was found guilty of one count of first degree murder and three counts of first degree robbery. The penalty for the murder was fixed as death for defendant and life imprisonment for Thomason. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

About 12:30 a.m. August 3, 1968, Rick Dwayne Taylor, age 19, was on duty as a liquor store clerk at Silver's Liquor Store in Long Beach.

While Taylor was waiting on a customer, Thomason and a person very similar to defendant entered the store. After the customer left, the other man approached Taylor, who had been watching both men, and Thomason in particular, from the time they entered the store, because he expected them to rob him. Taylor had been robbed a week before and was extremely wary at the time. At gun point, Thomason forced Taylor to give him $125 of the liquor store's money. Taylor was made to lie down on his face in back of the counter while the two men ran out of the store. Taylor immediately thereafter called the police. September 25, 1968, Taylor was shown a dozen photographs at the police station, and he identified a photograph of Thomason. He was not able to identify defendant from his photograph. He did notice that defendant's photograph showed blond hair, whereas the other man involved in the robbery had brown hair at that time.

About 1:45 a.m. August 20, 1968, Robert T. Molby was tending bar in Long Beach at the High Hat Cafe. There were three customers at the bar, including Louis Merklein. Defendant entered alone, wearing dark glasses, and ordered some beer. A few minutes later, Thomason entered, spoke with defendant, and then moved to where he could watch the patrons. Defendant pulled a gun on Molby and forced him to empty the cash register, put the money (about $60) in a paper bag, and lie down on the floor. After defendant and Thomason left, Molby called the police. He identified both defendant and Thomason at the preliminary hearing. From a stack of individual photographs, Merklein was able to identify both men, even though the photographs of defendant showed him with blond hair, while at the time of the robbery his hair was dark.

About 3:30 a.m. August 23, 1968, Jack Wall, age 19, was working at Lerner's Service Station on the northwest corner of 7th and Magnolia Streets in Long Beach. He noticed a 1958 black Pontiac turn right on 7th Street. Shortly thereafter, the two men who had driven by in the Pontiac entered the station. Wall identified defendant and Thomason as the two men. Defendant wore sun glasses. Later, defendant pulled a black .25 automatic on Wall and required Wall to give him the money in the cash box. Defendant then told Wall to go to the office. There, Wall was forced to give the man the money he had ready for the next shift and also his own wallet. Altogether, defendant and Thomason took $107 from the station and $65 from Wall. In addition, defendant required Wall to give him a big Texas belt buckle Wall was wearing. Defendant gave the belt buckle to Thomason. They then took some cigarettes, and defendant told Wall to lie on the floor. Defendant said that if he got up within 15 minutes, he would shoot him. A minute or so after defendant and Thoma-

son went out of the door, Wall started to get up; but defendant, who was standing by the telephone booth, took a shot at him. The shot missed Wall by about six inches.

A week later, police officers brought photographs to the service station, and from them Wall was able to identify both defendant and Thomason. Wall next saw defendant and Thomason at their preliminary hearing October 17, 1968. After Wall entered the court room, defendant was brought in and placed in the jury box. His hair was shaved off, and he was growing a mustache and a goatee. When he sat down, he looked at Wall, and it seemed to Wall as though he said, "You are a dead man." Wall had noticed that defendant had a gold tooth. At the trial, he examined defendant's teeth and verified that the gold tooth in defendant's mouth was the way it had looked the morning of the robbery. September 11, 1968, a detective sergeant found a .25 caliber empty cartridge case in the gutter by the service station, partially imbedded in an inch of mud.

Shortly after 1 a.m. August 24, 1968, defendant entered Lucky's Doll House in Long Beach. He had black hair, full across the sides and combed straight back, and was wearing horn-rimmed sun glasses. He was clean shaven and very heavy set. James Hutcheson, the bartender, Irene Hanson, the cocktail waitress, and two customers, Tex D. Hensley and Gary K. Jonasson, were in the bar at the time. Defendant ordered two draft beers. He later walked over to the end of the bar and accused Jonasson of staring at him, telling him to stop it. A few minutes later, Thomason came in, walked over to the pool table, and racked up the balls. Defendant took the beers to the pool table, and he and Thomason played pool until about 10 minutes before 2 o'clock. Hutcheson was suspicious of the two men, watched them closely, and took his gun out from underneath the cabinet. Irene Hanson and her husband, who had come to pick her up, also feared trouble. At 2 o'clock, Hutcheson asked defendant and Thomason to leave, because it was time to close. They did so, and Hensley also walked out.

About 2:15 or 2:20, Hutcheson, Jonasson, and the Hansons went out the front door and walked to the parking lot. There defendant and Thomason, each with a gun, stopped them. Defendant said, "This is a hold up." Hutcheson laughed, saying it was comical because he had only $6 in his pocket. Defendant told Hanson to lie down, and Hanson did as he was told. Defendant and Thomason then took Hutcheson to the other side of the car by which they had been standing and, with defendant pressing a gun to the back of his head, told him to go into the bar and open the safe. Hutcheson told them that once he locked the safe, he could not open it. Defendant said, "You better be able to or we going to deface the

girl—the pretty girl." Hutcheson said there was nothing he could do about it. Defendant then took Hutcheson's wallet and made him lie on his stomach with his face down. The wallet contained Hutcheson's social security card, his draft card, and his draft registration. Defendant approached the Hansons and Jonasson and told the latter three or four times to lie down, but Jonasson just stood there. Defendant asked him how he would like to have some bullets in him, and he fired a shot into the air. Jonasson still would not lie down, and defendant then shot him four times. Defendant and Thomason fled, and the Hansons and Hutcheson called the police. Later in the day, four .25 caliber shells were found in the parking lot and turned over to the police. Jonasson died September 6, 1968, as a result of the gunshot wounds.

Hutcheson testified on cross-examination that he went to a lineup but was not able to identify defendant and that he was not able to identify him from mug shots shown to him by the police prior to the lineup. Hutcheson saw a newspaper article showing defendant's photograph, and he was not able to identify him from that photograph either. However, when an article appeared in the paper September 21, 1968, with photographs of both defendant and Thomason, and Hutcheson darkened the hair on defendant, he recognized him.

Hanson saw defendant in a lineup August 30, 1968, but he did not make a positive identification at that time because of the color of defendant's hair. It was blond instead of black. At the preliminary hearing, he identified both Thomason and defendant, but noted that defendant looked 20 pounds lighter, had shaved off his hair, and had grown a goatee and a mustache. The first time Hanson was able to identify anyone positively was when defendant's hair was colored black in his photograph in the paper. Irene Hanson did not positively identify defendant in the lineup or from mug shots. She picked out one photograph of defendant and said it looked like him except for the bleached blond hair.

About 12:30 a.m. August 28, 1968, defendant entered Western Union's office at 214 Locust Street in Long Beach. He was wearing sun glasses, and his hair was bleached blond. He told the night manager, Maurice E. Real, that he wanted to send a telegram or money order to San Francisco. Real directed him to a table in the lobby containing blanks. Later, defendant returned to the counter and presented a telegram to Real. As defendant handed the telegram to him, Real noticed that he had a tattoo on his left hand. (At the trial, defendant presented his left hand to the witness, and Real testified that the tattoo was in the same location.) Written on the

telegram were the words, "Give me your money." As Real looked up, defendant was pointing a .25 automatic at him. Just as Real started to give defendant the money, Robert Lange and David C. Stevens walked into the office. Defendant told Real to act normally, and he placed the gun under his left armpit and backed away from the counter. The two men came up to the counter and asked if a money order Lange was expecting had arrived. Defendant remained just to the right of them by a couple of feet. Real checked to see if the money order had come, but it had not; so the two men left. After Real gave defendant the money ($30-$40), defendant made him lie down on the floor. Defendant then left. Real did not go to a lineup, but he identified defendant from photographs shown to him. He also identified defendant at the preliminary hearing. At that time, defendant's hair was dark and short. At the trial, a handwriting expert testified that he had compared defendant's handwriting exemplar with the handwriting on the Western Union telegram, "Give me your money," and formed the opinion they were written by the same person.

David C. Stevens testified that as he and Lange, both Navy sailors on the USS *Ticonderoga*, entered the Western Union office, defendant moved with his left hand a piece of paper which had been in front of Real; that there was a tattoo mark on defendant's left hand; that defendant had his right hand in his armpit; that he had seen a flash of something "kind of a blue gunmetal" as defendant had folded his arms; that after he and Lange left, they saw a police car come up to the Western Union office; that they returned to Western Union and learned there had been a robbery; that they gave defendant's description to the police; that about 2 a.m. they saw defendant, wearing the same clothes and dark glasses and with the tattoo on his left hand, in front of a bar; and that they immediately notified the police, who then arrested defendant.

*The Weapon*

About the middle of July 1968, defendant purchased a .25 automatic from Edwin E. Howard, who owned the Snuggle Inn, a bar in Long Beach. Defendant had told Howard that he needed a gun, because some people were bothering his wife or fiancee, and he was going East carrying money. A .25 automatic was introduced in evidence as Exhibit 3. It had a distinctive mark on the right side of the handle. Although Howard testified that he could not be sure it was the same gun, he admitted that the gun he sold defendant had a similar mark on it.

Leonard and Louise Dobrowolski managed the apartments at 80 Maine in Long Beach. They owned a 1959 beige Cadillac, which they had lent

to defendant the day before he was arrested. The afternoon of defendant's arrest, Leonard had gone to Ocean and Pacific to pick up the car. That day, Louise was driving the car and when she made a sudden stop, a gun that looked like Exhibit 3 fell out from underneath the dashboard on the driver's side. August 29, 1968, two police officers contacted Louise at 80 Maine Street and found a .25 automatic (Exhibit 3) under her mattress in the bedroom. She said she knew of the gun but did not know it was there. Kathy Springer had told the officers the gun was in the Dobrowolski apartment. Later tests indicated that the bullets taken from Jonasson's body and the cartridges found at Lerner's Service Station and the parking lot at The Doll House had been fired from the gun.

## Thomason's Arrest

On the afternoon of September 2, 1968, Thomason went into a liquor store owned by Israel Katz in Hollywood. He later came to Katz at the cash register with something like a soda in his hand and said, "Ring me up." Katz did not want to ring up the cash register, as he thought that Thomason was the person who had robbed him a year ago and that he might be preparing to rob him again. Finally, Thomason dropped his wallet on the counter and said, "Oh boy, no money." He ran out of the store, saying he would be right back. Katz and a customer saw him get into a car with another person and drive away. The customer wrote down the make and license number of the car ("JFR 711 out-of-state license green Corvair 61 or 62"). Katz turned the wallet over to the police. In it were the social security card and draft papers of James Edward Hutcheson, as well as a bill of sale to Michael L. Pepper for a 1958 Pontiac, photographs (including one of Thomason and a woman), traffic tickets of Thomason, and a receipt signed by L. Dobrowolski.

Mrs. Katz, who managed the apartments where Thomason lived, had previously reported that she had seen two persons changing license plates on a Corvair in front of her apartment. On September 17, 1968, Thomason was arrested in one of the apartments. At the time of his arrest, he was wearing the belt and buckle taken from Jack Wall in the Lerner's Service Station robbery. In the meantime, investigation had revealed that the license plate (Minnesota) on the Corvair in which Thomason left Mr. Katz' liquor store had been registered to the 1958 Pontiac. The 1958 Pontiac was found parked near the apartment house.

## Defense

Katherine Springer testified that she met defendant August 12 or 13, 1968, and had never seen him with any other than blond hair; that they

were together almost every night at the Snuggle Inn, at her apartment, or at defendant's apartment; that on the evening of August 23 and into the morning hours of August 24, 1968, she was with defendant at all times; that they met at 5:30 p.m. at the Snuggle Inn and then went to the Plush Poodle at 6 or 6:30, remaining there until 2 a.m., when it closed; that she remembered that evening, because it was his girl friend's birthday, and he spent the evening with her instead of the other girl; that after leaving the Plush Poodle, she and defendant went to her apartment, where he remained all night; and that he did not leave her apartment until 10:30 or 11 o'clock the next morning. Miss Springer testified that the officers had indicated to her that if she knew the location of the gun defendant had used, they would let her see him, and that she told them. In rebuttal, one of the officers testified that she told him that if he would let her visit defendant, she would show him where the gun could be found, and that he agreed to let her see defendant if he recovered the gun where she said it would be.

Defendant testified in his own behalf that he came to Long Beach some time after July 6, 1968; that within the first two weeks of August he became a blond, bleaching his hair to match the hair of his girl friend, Martha Henderson, and he remained a blond during the month of August; that he wanted to purchase a gun, because Martha was having a problem; that Howard had sold him a .25 Browning U.S.-made automatic, which defendant thereafter kept behind the cash register at the Snuggle Inn; that he sold the gun to Steve Jackson during the latter part of July; that from 5:30 or 6 in the evening until 2 a.m. he worked for Howard at the Snuggle Inn, checking identifications, handling beer kegs, making sandwiches, and keeping the peace; that he had no recollection of his whereabouts 12:30 a.m. August 3, 1968, or 1:45 a.m. August 20, 1968, but in each instance he should have been working at the Snuggle Inn; that 3:30 a.m. August 23, 1968, he was with Katherine Springer in her apartment at 80 Maine; that he remembered the date, because Martha had a birthday August 26, 1968, and was celebrating it Friday, the 23d; that she and a fellow named Shorty Lampley were having their birthday party at the Snuggle Inn the next day; that they moved the party to the Plush Poodle across from where he lived; that he was not at Lucky's Doll House August 24, 1968; that he had worked until 2 a.m. August 23, 1968; that that evening he went from the Snuggle Inn to the Plush Poodle, arriving there about 6 p.m.; that he took Katherine Springer with him; that they did not leave the Plush Poodle until 2 a.m. August 24, 1968; that they went to her apartment at 80 Maine; and that he stayed there until 10:30 a.m.

Defendant further testified that he knew the Western Union clerk, Real, having seen him several times at the Snuggle Inn; that one night when he was drinking at the bar, Real told defendant that he was working at Western Union, his wife was pregnant, and he was interested in making some extra money; that a day or so later Real came into the Snuggle Inn and suggested that defendant rob the Western Union office, and they would split the "take"; and that Real was going to give the police a wrong description.

On cross-examination, defendant testified that the next time he saw Real was 12:30 a.m. August 28, 1968; that he was not armed on that occasion; that he was acquainted with Leonard Dobrowolski as the manager of 80 Maine and had borrowed his car at 7 p.m. August 27, 1968, telling him he wanted to go to Shorty Lampley's house to see about a motorcycle; that he took the car to see Shorty and returned to the Snuggle Inn, remaining about half an hour; that he left the bar about 8:30, telling Howard he was going to another bar called The Box; that after the fake robbery with Real, he went to The Box to wait for a girl named Sherri; and that that was where he was arrested. Defendant further testified on cross-examination that Martha Henderson was his common law wife, and Katherine Springer was his girl friend; that he and Martha had been living together for a year and had moved into 23 Elm Street together; that he wore dark glasses only because he was nearsighted, and his dark glasses were the only prescription glasses he had; that he was acquainted with Thomason only by reason of the fact that Thomason frequented the Snuggle Inn bar; and that he was in the United States Navy stationed at the Long Beach Naval Station, and was absent without leave.

Maurice Real denied ever having seen defendant before the robbery August 28, 1968, denied that there was any prearrangement between the two men for defendant to come in and fake a robbery, and denied ever having been in the Snuggle Inn. He testified that he had two children, ages 6 and 9, and that his wife was not pregnant during 1968.

Defendant contends that the trial court erred in receiving in evidence the former testimony of the Dobrowolskis given at the preliminary hearing, but there is no merit to this contention. The Dobrowolskis testified at the preliminary hearing that defendant had used their Cadillac on the night of the robbery of the Western Union office and that the following day the murder weapon was found under the dashboard of the Cadillac. Upon a showing that the Dobrowolskis were unavailable and could not with due diligence be found in the State of California, the trial court admitted in evidence their testimony at the preliminary hearing. Defendant contends

that the district attorney failed to use due diligence, arguing that if he had sought earlier to have the Dobrowolskis personally served with summons, the process server would have become aware that they had moved in ample time to have located them for appearance at the trial.

At the time of the preliminary hearing October 17, 1968, both of the Dobrowolskis were friendly and cooperative. Since they managed the apartment building at 80 Maine, and one of them had to be at the building at all times, it was arranged at that time to shuttle the two witnesses, the building being only two or three blocks from the court house. No difficulty in having the Dobrowolskis appear at the trial was anticipated, and the district attorney's office therefore followed its usual practice of mailing subpenas to witnesses, notifying them, "You are on call. Do not appear until notified." The subpenas so mailed are accompanied by a pamphlet explaining the duties and obligations of the witness. On the back of the pamphlet, it is stated that the procedure has the approval of all of the supervisors and the Superior Court of Los Angeles County.

Subpenas were mailed to all witnesses, including the Dobrowolskis, November 20, 1968, the trial at that time being set for January 9, 1969. There was no indication on the district attorney's record that any of the subpenas were returned as undeliverable. The charges against defendant were later consolidated, the trial date was continued to February 19, 1969, and subpenas were mailed January 16, 1969. ■ Some time between that date and February 19, 1969, the subpenas mailed to the Dobrowolskis were returned. After trailing to February 20, February 21, February 26, and February 27, defendant's trial was continued to March 3 and then to March 4, at which time selection of the jury commenced. March 6 the jury was impaneled, and the actual trial began; and March 14 the testimony of the Dobrowolskis at the preliminary hearing was read to the jury.

The subpena records of the district attorney's office show a notation opposite Leonard Dobrowolski's name, "P/S," which indicated that the investigator for the district attorney's office in charge of obtaining the attendance of witnesses, Gary T. Komers, anticipated personally serving Dobrowolski. The notation was apparently made between November 20, 1968, and January 9, 1969, but no effort was made to serve the Dobrowolskis until January 27. This was due to Komers' having been advised by the Long Beach Police Department that the Dobrowolskis were very cooperative, that they were the managers of the building, and that there was no reason to doubt their ability or capacity to appear when they were called.

January 27, 1969, three days after Komers learned that the Dobrowolskis had moved, as shown by the return of their subpenas, he sought to have personal service effected. The evidence of his efforts constitutes overwhelming support for the trial court's finding that due diligence had been exercised since the week beginning January 27, 1969, to locate the missing witnesses. Among other things, he followed several leads in the Long Beach area, contacting a trailer park to which he learned the Dobrowolskis had moved, utility companies, hospitals, and the county coroner; checked with the C.I.I. (Criminal Identification Investigation) and the law enforcement agencies in several jurisdictions in California and, upon receiving information that the Dobrowolskis had gone to San Antonio, Texas, checked with the police department there, as well as at Corpus Christi, Texas, there being an indication they may have gone to that city; and checked with Texas state agencies, the Arizona Highway Patrol, the immigration service, and the F.B.I.

The trial judge commented on the procedure of mailing subpenas and acknowledged that it did not give dignity to a subpena when so served, but recognized that it was an acceptable procedure in Los Angeles County, in view of the exigencies facing law enforcement agencies at this time, and held that there was no negligence on the part of the prosecution resulting in the unavailability of the Dobrowolskis. The trial court further found that a reading of the preliminary transcript indicated that the cross-examination at the preliminary hearing was adequate. Under the circumstances, the trial court properly admitted the Dobrowolskis' testimony. (*California* v. *Green*, 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]; *People* v. *Smith*, 4 Cal.App.3d 403, 405-411 [84 Cal.Rptr. 412]; *People* v. *Benjamin*, 3 Cal.App.3d 687, 692, 698 [83 Cal.Rptr. 764].)

As stated in *People* v. *Peters*, 276 Cal.App.2d 71, 78 [3] [80 Cal.Rptr. 648]: "Whether due diligence has been shown is a factual question to be determined according to the circumstances of each case. [Citation.] Unless there has been an abuse of discretion, the ruling of the trial judge will not be disturbed. [Citations.]" (*People* v. *Dunn*, 29 Cal.2d 654, 660-661 [177 P.2d 553].) No abuse of discretion has been shown here.

Defendant's reliance on *People* v. *Harris*, 266 Cal.App.2d 426 [72 Cal. Rptr. 423], is misplaced. Contrary to the situation existing here, no evidence was produced in that case in support of the claim of due diligence. The entire good faith showing consisted of statements of counsel detailing the number of times that process servers had visited the home of the missing witness, who, according to the prosecution, was somewhere in Canada.

Defendant argues that the use of a preliminary hearing transcript has the same effect as the use of a deposition, since it denies the defendant the right of confrontation and cross-examination before the actual trier of the case, and that therefore, there being a constitutional prohibition against the use of depositions in a homicide case (Const., art. I, § 13), it is improper to permit the use of a preliminary hearing transcript in a homicide case. There is no merit to this contention. ■ It is settled that the constitutional prohibition referred to has no bearing on the admission of evidence taken at a preliminary hearing. (*People* v. *Clark,* 151 Cal. 200, 204-205 [90 P. 549]; *People* v. *Sierp,* 116 Cal. 249, 250-254 [48 P. 88]; see Evid. Code, §§ 1290-1291.)

■ Defendant complains that at the time the Dobrowolskis testified at the preliminary hearing he was not aware that they had suffered prior felony convictions and that he had a right to confront them with information regarding those convictions for the purpose of impeachment. There was, however, ample corroboration of the testimony of the Dobrowolskis through the testimony of defendant's girl friend, Katherine Springer, and Edwin Howard, his alleged employer. ■ Defendant also claims that he was entitled to cross-examine the Dobrowolskis as to the color of his hair, but the only issue affected by their testimony was the murder weapon.

Defendant further contends that he was denied the right to counsel or due process of law in pretrial identification procedures. ■ In the trial court, defendant had moved to suppress the evidence of identification as to him, on the ground that the circumstances surrounding his identification by the witnesses were so suggestive as to give rise to a substantial likelihood of irreparable misidentification. To support his motion, he put on the testimony of himself, Robert Molby, Irene Hanson, James Hutcheson, Rick Dwayne Taylor, and Jack Wall. After hearing the testimony, the trial court denied defendant's motion, ruling: "It appears to me that the facts developed on cross as well as some of the facts developed on direct examination, indicate that there was no unfairness indulged in by the officers in the identification procedures involved in this case. I also [base] that conclusion on what is contained in the transcript.

"In other words, I would say that the proof is clear and convincing that the in-court identification at the time of the preliminary hearing was based upon observations by the witnesses of the accused defendants on the occasions of the episodes dealt with in this case."

From the evidence hereinabove recited, it is clear that each of the witnesses who identified defendant had ample opportunity to observe him at the time of the commission of the various crimes and that most

of them looked at him especially closely because of an anticipation that he might be preparing to rob them; and they testified that their in-court identifications were based on their recollection of the events occurring at the time of the particular crime.

Defendant argues that the identification testimony of both Taylor and Molby with respect to him was inconclusive, confused, unclear, unconvincing, and not positive and should therefore have been suppressed. ■ Any lack of convincing quality or positive identification of defendant by the witnesses, however, would merely go to the weight of their testimony and not to its admissibility. (*People* v. *Gonzales,* 68 Cal.2d 467, 472 [5] [67 Cal.Rptr. 551, 439 P.2d 655].)

Defendant has failed to show that the police engaged in improper pretrial identification procedures. ■ In any event, there being evidence that his in-court identification had an origin independent of any pretrial identification procedure, it was properly received. (*In re Hill,* 71 Cal.2d 997, 1006 [80 Cal.Rptr. 537, 458 P.2d 449].)

Finally, defendant contends that the trial court erred in denying his motion for a new trial on the ground of the inadmissibility of the testimony of Officer McMahan. While testifying, Molby was shown photographs allegedly displayed to him shortly after the robbery at his bar. Although he testified that he was able to make a positive identification of defendant from the photographs shown to him shortly after the robbery, he identified only four of the sixteen photographs shown to him in court as photographs shown to him previously. Subsequently, Officer McMahan was put on the stand and testified that the photographs were the same ones exhibited to Molby shortly after the robbery and that at that time he had picked out all the photographs of defendant and all the photographs of Thomason (a total of seven photographs).

Likewise, Officer McMahan testified that Merklein had identified all the photographs of defendant and all the photographs of Thomason. Merklein had testified that when he was shown photographs shortly after the robbery, he identified both men from the photographs; but when asked to select which of the photographs he had identified previously, he did not pick out all the photographs of defendant and Thomason.

Taylor testified that he had made a positive identification of Thomason but had not positively identified any of the photographs depicting defendant. McMahan testified that Taylor had selected the photographs of both defendant and Thomason, but although he had been positive in his identification of Thomason, he had stated he was not positive about defendant.

Defendant contends that the testimony of Officer McMahan was introduced for the purpose of impeaching the testimony of prosecution witnesses as to pretrial identifications and that the trial court, by failing to give instructions as to the purpose of the testimony, erroneously permitted the jury to make use of the evidence for the truth of its contents.

█ All the witnesses with respect to whose allegedly prior inconsistent statements Officer McMahan testified were present in court and available for cross-examination concerning their current and prior statements. Under the circumstances, the officer's testimony was admissible for the truth of its contents under section 1235 of the Evidence Code, which provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."[1] (*California* v. *Green, supra,* 399 U.S. 149, vacating the judgment of this court in *People* v. *Green,* 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422], and rejecting this court's holding in *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111].)

In view of this court's decision in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], that the death penalty violates our state constitutional provision against cruel or unusual punishment, the judgment is modified to provide for life imprisonment and, as so modified, is affirmed.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment.

---

[1]Under Section 770, the witness must be given an opportunity to explain or deny the prior statement at some point in the trial.