[Crim. Nos. 12007, 12146. In Bank. Sept. 11, 1969]

In re JOSHUA N. HILL on Habeas Corpus.

[Crim. No. 12125. In Bank. Sept. 11, 1969.]

In re JAMES W. SAUNDERS on Habeas Corpus.

998

James William Saunders, in pro. per., Michael E. Ballachey, under appointment by the Supreme Court, Paul N. Halvonik, Gary D. Berger, Jerome B. Falk, Jr., Charles Stephen Ralston, John Bartko, Anthony G. Amsterdam, Richard Bancroft, Roy Eisenhardt, Jack Greenberg, Leroy D. Clark, Marshall Krause, Harry J. Kreamer, Garfield Stewart and Nathaniel Colley for Petitioners.

Thomas C. Lynch, Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

SULLIVAN, J.—These separate petitions for writs of habeas corpus present common questions as to the lawfulness of petitioners' confinement at the California State Prison at San Quentin. We therefore proceed to treat them together.

Joshua N. Hill and James W. Saunders, petitioners, along with a third codefendant, Ben Madorid, after a joint trial were convicted of murder, assault with intent to commit murder and robbery. The jury found the robbery and murder to be of the first degree and fixed the penalty of petitioners Hill and Saunders at death on the murder count.[1] We affirmed the judgments against both petitioners on their automatic appeals under Penal Code section 1239, subdivision (b), (*People* v.

---

[1]Madorid was sentenced to life imprisonment. He did not appeal and is not a petitioner in the instant proceedings.

*Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908]); and they are presently awaiting execution of their death sentences.

In Crim. 12125, petitioner Saunders by an amended petition filed in propria persona seeks a writ of habeas corpus upon the grounds: 1) that his conviction was imposed in violation of the due process clause of the Fourteenth Amendment to the United States Constitution because it was based in part upon an in-court identification by a witness to an uncharged similar offense who, prior to such identification, had viewed petitioner at an unfairly conducted police showup; 2) that his conviction was also obtained in violation of the Sixth and Fourteenth Amendments in that the admission of the extrajudicial confessions of his two codefendants which implicated petitioner deprived him of the right to cross-examination guaranteed by the confrontation clause of the Sixth Amendment as made applicable to the states through the Fourteenth Amendment; 3) that the sentence of death cannot lawfully be carried out against him because veniremen were excused for cause from the jury in violation of the standards set forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; and 4) that he was deprived of a jury which fairly represented a cross section of the community because prospective jurors with conscientious scruples against capital punishment were excluded thereby resulting in "a jury whose members were partial to the prosecution on the issue of guilt or innocence."

A supplement to the foregoing petition has been filed on behalf of petitioner by an attorney alleging the additional grounds: 1) that petitioner, as an indigent, has been denied equal protection of the laws because of the failure of the State of California to appoint counsel for him while he was awaiting execution of his sentence of death; 2) that persons with conscientious objections to the death penalty were excluded from the jury thereby depriving petitioner of jurors representing a valid cross section of the community on both the issues of guilt and penalty; and 3) that the death penalty as administered in California is unconstitutional because, a) the jury is without standards in making its determination as to penalty and, b) the death penalty constitutes cruel and unusual punishment.

In Crim. 12007, petitioner Hill seeks a writ of habeas corpus on the grounds: 1) that petitioner, as an indigent, has been denied equal protection of the laws by the failure of the

State of California to provide counsel after the termination of his automatic appeal; 2) that petitioner was deprived of a jury representing a valid cross section of the community on the issues of guilt and penalty since persons with cons100tious objections to the death penalty were excluded from his jury for cause; and 3) that the death penalty in California is unconstitutional for the same reasons alleged in the petition filed on behalf of Saunders. In addition, in Crim. 12146, Hill has filed in propria persona a petition for writ of habeas corpus in which he contends, in language identical to that of petitioner Saunders, that his conviction was imposed in violation of the due process clause of the Fourteenth Amendment because of an unfairly conducted pretrial police show-up.

We issued orders to show cause in favor of petitioner Saunders in Crim. 12125 and in favor of petitioner Hill in Crim. 12007 and Crim. 12146, and we appointed counsel to represent Saunders.[2]

Petitioners were convicted of the robbery of the Laurbank Liquor Store in North Hollywood on September 16, 1964, the murder of the clerk of that store, and the assault with intent to commit murder of another person who was in the store. The actual perpetrators of the crimes were Hill and Madorid; Saunders drove the getaway car. All three defendants were arrested in Las Vegas, Nevada, where they had forced Madorid's friend, John Niehoff, to drive them on the day following the murder. While in Las Vegas, Hill and Madorid made full confessions in which each implicated the other defendants. Saunders made a written statement in which he indicated that Hill and Madorid robbed the store, that when he drove them to the scene of the crime he had no knowledge that a robbery was contemplated, and that he did not learn of the crime until after it had been committed. However, on the way to his arraignment in Los Angeles, Saunders admitted to a police officer that he knew a robbery was contemplated when he drove Hill and Madorid to the store and that he had shared in the proceeds of the robbery. We held that petitioners' confessions were properly admitted at their trial against claims that such confessions were involuntary and were obtained in violation of the rules set forth in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]

[2]Michael E. Ballachey, Esq., has been appointed to represent petitioner Saunders. Paul N. Halvonik, Esq., one of the attorneys who filed the petition on behalf of Hill in Crim. 12007, volunteered to represent him in Crim. 12146.

and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Madorid took the stand at trial on the issue of guilt and testified substantially in accord with his extrajudicial confessions. Neither Hill nor Saunders testified although Saunders through his counsel urged the jury to disregard his confession and find that when he drove Hill and Madorid to the Laurbank Liquor Store he had no knowledge that a robbery was contemplated.

There was also introduced at the trial the testimony of Thomas Spero, called as a witness by the People. Spero was a clerk at the Sands Liquor Store in the San Fernando Valley. He testified that on September 13, 1964, three nights prior to the crimes with which petitioners were charged, two men robbed the Sands Liquor Store, hit him over the head and shot him in the leg. He made an in-court identification of petitioners as being the perpetrators of that crime. We held that Spero's testimony was admissible as being relevant to show "a common plan or scheme [on the part of petitioners] and thereby knowledge on the part of Saunders as to the modus operandi and probable consequences in the case at bench. [Citation.]" (*People* v. *Hill, supra,* 66 Cal.2d at p. 557.)

Petitioners now contend that Spero's courtroom identification of them was tainted by a pretrial show-up conducted by the police which was so unduly suggestive to Spero that it deprived petitioners of due process of law.

Spero testified that on the evening of September 13 he was working alone at the Sands Liquor Store. About 11 or 11:30 p.m. petitioners entered the store and stood together at the counter. They asked Spero for a six pack of Schweppes Tonic Mix; Spero turned and walked down one side of a long freezer located in the middle of the store. Petitioner Hill went around the other side of the freezer and walked in a direction parallel to Spero to the end of it, passing out of Spero's sight for just seconds; Saunders stayed behind Spero. When the latter reached the end of the freezer and bent over to pick up the beverage he looked up and saw that Hill was holding a gun on him. Hill said: "We aren't fooling around. This is a holdup." He ordered Spero to turn around and when Spero complied Hill hit him over the head with the butt of the pistol causing a bleeding wound on the back of his head. Spero testified that the blow dazed him but that he did not lose consciousness. Seconds after being hit on the head he was shot in the left leg and fell to the floor. In compliance with Hill's

orders, he crawled to a corner of the store. He sat there and watched Saunders take money out of the cash register. When asked how much time he had had to observe Saunders before being struck on the head, Spero answered, "More than enough time to be able to recognize him if I saw him again . . . Perhaps thirty seconds." While he was sitting on the floor Spero was told several times by Hill to turn around, but he refused to do so. Finally, petitioners left the store after having been there "under five minutes." When the police arrived Spero gave them a description of petitioners' hair color, clothing, approximate height and approximate ages. He also described them to the police the next morning.

On cross-examination by defense counsel it was brought out that on October 2, 1964, the day of petitioners' preliminary hearing, Spero was requested by a police officer to come to the courthouse to identify someone. When Spero reached the courthouse the police informed him that they wanted him to see if he could identify the parties who robbed the Sands Liquor Store and assaulted him. He was then taken to a holding cell behind the courtroom of which petitioners were the sole occupants. When asked by the police if he could identify them Spero indicated that they were the men who robbed and assaulted him.

Both petitioners contend that the above-described pretrial confrontation was so unnecessarily suggestive that it deprived them of due process of law. They assert that Spero's courtroom identification was tainted by the pretrial viewing and that it therefore was inadmissible. Since the pretrial identification occurred prior to June 12, 1967, the effective date of *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], and *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], petitioners do not attempt to avail themselves of the nonretroactive rule of those cases guaranteeing the right to counsel at the show-up. (See *Stovall* v. *Denno* (1967) 388 U.S. 293, 300 [18 L.Ed.2d 1199, 1205, 87 S.Ct. 1967]; *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) Rather, petitioners contend that the manner in which the show-up was conducted and the resulting in-court identification denied them due process of law under the rules of *Stovall* v. *Denno, supra,* 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1205-1206, 87 S.Ct. 1967], and *People* v. *Caruso* (1968) 68 Cal.2d 183, 188 [65 Cal.Rptr. 336, 436 P.2d 336].

*Stovall,* a federal habeas corpus proceeding, held that al-though the petitioner therein could not avail himself of the right to counsel rules of *Wade* and *Gilbert* since those rules were not retroactive, he would nevertheless be entitled to relief if he could demonstrate that "the confrontation ,conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. This is a recognized ground of attack upon a conviction independent of any right to counsel claim. [Citation.]'' (388 U.S. at pp. 301-302 [18 L.Ed.2d at p. 1206].) Since petitioners' appeals were decided prior to the decision in *Stovall* they are entitled to raise this issue in the instant collateral proceedings. "There is no question of the retroactivity of Part II of *Stovall,* . . . for the due process concept there enunciated is an integral part of our criminal jurisprudence. The impact of *Stovall,* therefore, has manifested itself not in the creation of new law, but rather in a reevaluation of traditional due process concepts with a view toward contemporary law enforcement practices.'' (*United States* v. *O'Connor* (D.D.C. 1968) 282 F.Supp. 963, 964.)

The watchword of due process of law is fundamental fairness and it has been said that in the matter of identification gross unfairness often results from "the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.'' (*United States* v. *Wade, supra,* 388 U.S. at p. 228 [18 L.Ed.2d at p. 1158] ; see *People* v. *Caruso, supra,* 68 Cal.2d at p. 188.) One of the most condemned pretrial identification procedures is that of showing a suspect alone to witnesses to a crime as was done in *Stovall.* "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police.'' (*United States* v. *Wade, supra,* 388 U.S. at p. 234 [18 L.Ed.2d at p. 1161].) We must thus initially determine whether the method used by the police to present petitioners to Spero was unduly suggestive within the rule of *Stovall* keeping in mind the caveat that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, . . .'' (*Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at p. 1206].)

The pretrial identification of petitioners by Spero was "at variance with the time honored method universally recognized by law enforcement persons, which permits a complainant to select, *from among several persons* one about whom he is cer-

tain.'' (Italics added.) (*United States* v. *Gilmore* (7th Cir. 1968) 398 F.2d 679, 682-683.) Under the totality of the circumstances we think that the identification procedure was so unnecessarily suggestive to Spero that it deprived petitioners of due process of law. Spero was a witness who, was robbed, battered and shot by his assailants. Two and one-half weeks later the police requested him to come to the courthouse to see if he could identify the men who robbed and assaulted him. He was taken to a holding cell behind the courtroom which contained only petitioners and he was there asked by the police if he could identify his assailants. This isolation method of identification is the type which was criticized by the above-cited authorities and does not differ in any material respect from bringing petitioners to Spero while handcuffed to police. The element of suggestion inherent in this procedure is not even subtle. The police, by showing petitioners to Spero while alone in a jail cell, '' [i]n effect . . . said to the witness, '*This* is the man.' '' (Original italics.) (*Foster* v. *California* (1969) 394 U.S. 440, 443 [22 L.Ed.2d 402, 407, 89 S.Ct. 1127].)

Contrary to the situation in *Stovall* there do not appear to be any circumstances in the instant case which necessitated the prejudicial police conduct. In *Stovall* the suspect was brought to the witness' hospital room while handcuffed to police. The court determined, however, that because of the witness' physical condition it was the most reasonable method of identification. Here, however, Spero was asked to see if he could identify petitioners as the perpetrators of a crime *other* than that with which they were charged. The Attorney General asserts that because the Spero identification was not for the purpose of identifying petitioners as the perpetrators of the crimes for which they were being tried, "it was not reasonable for the police officers to arrange an elaborate line-up for Spero." On the contrary, we think that under these circumstances the police had no reason whatsoever *not* to establish a method of viewing petitioners which would have been fair to them. There was no compelling reason to exhibit petitioners to Spero while they were alone in a cell. Since petitioners were already in custody for a crime other than the Spero robbery there was no necessity for a hasty and prejudicial identification procedure such as there was in *Stovall*. It would have been no hardship for the police to have assembled a number of prisoners and to have held a lineup in the usual manner, especially since petitioners were then being held in

the Los Angeles County jail. ■ By exhibiting petitioners alone to Spero while in a jail cell with no compelling reason for doing so the police used methods which were unnecessarily suggestive under the circumstances.

However, the holdings of *Wade* and *Gilbert* provide that a finding of an unduly suggestive pretrial identification procedure does not automatically render inadmissible the in-court identification. The court said in *Wade*: "We think it follows that the proper test to be applied in these situations is that quoted in *Wong Sun* v. *United States*, 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407], '[W]hether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (*United States* v. *Wade, supra,* 388 U.S. at p. 241 [18 L.Ed.2d at p. 1165].) In applying this test to the case before it the court stated that if the prosecution could "establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification," (*id.,* at p. 240 [18 L.Ed.2d at p. 1164]) then the courtroom identifications would be admissible despite the improperly conducted show-up. (See *Gilbert* v. *California, supra,* 388 U.S. at p. 272 [18 L.Ed.2d at p. 1186].) The question for our determination is therefore whether it appears from the record now before us that Spero's courtroom identification of petitioners had an origin independent of the pretrial show-up and was thus untainted thereby.

When petitioners entered the Sands Liquor Store they were not masked and appeared to be normal customers. A period of at least 30 seconds elapsed before Spero was struck on the head and shot in the leg by Hill. At that time he fell to the floor but did not lose consciousness. He continued to watch his assailants from a corner of the store and three times refused to turn around when ordered to do so by Hill. He testified that he observed Saunders for "more than enough time to be able to recognize him if I saw him again." He described his assailants to police shortly after the robbery and again furnished them with a description the next morning. In the courtroom when asked if any of the defendants were in the store the night of the robbery he indicated petitioners.

Under these circumstances we believe that the evidence clearly and convincingly shows that Spero had more than an adequate opportunity to observe petitioners at the time of the

obbery. (See *People* v. *Farley* (1968) 267 Cal.App.2d 214, 218 [72 Cal.Rptr. 855] ; *People* v. *Lasiter* (1968) 265 Cal.App. 2d 361, 366-367 [71 Cal.Rptr. 218].) Petitioners spent an appreciable amount of time in the store, unmasked, under presumably adequate lighting conditions. Spero's opportunity to observe petitioners was good and he never lost consciousness despite being hit over the head and shot. Presumably aware that he might sometime have the opportunity to describe or identify them, he continued to observe his assailants from his position on the floor. His statement that he saw Saunders for more than enough time to recognize him if he ever saw him again signifies that Spero undertook a conscious effort to acquaint himself with the robbers. We think that this testimony furnishes clear and convincing evidence that the in-court identification was not tainted by the illegal lineup. (See generally *Clemons* v. *United States* (D.C. Cir. 1968) 408 F.2d 1230.) There was thus no error in the admission of Spero's courtroom identification of petitioners.

Petitioner Saunders next asserts that he was prejudiced by the trial court's admission of the extrajudicial confessions of his codefendants, Hill and Madorid, insofar as they implicated him. He contends that the introduction of such confessions at the joint trial without effective deletion of references to him deprived him of the right to cross-examine his confessing codefendants in violation of the confrontation clause of the Sixth Amendment to the United States Constitution.[3] Although Hill does not make the same contention as to the admission of the extrajudicial confessions of Saunders and Madorid implicating him, nevertheless, for reasons which will later appear, we proceed to consider on our own motion any such error as to him.

All three defendants made extrajudicial confessions to the robbery and murder of September 16. On petitioners' automatic appeals we held that these confessions were properly admitted against each confessing petitioner at trial. The confessions of each implicated the others and the trial court fully instructed the jury that each confession was only to be considered against the confessing defendant and was not to be considered as evidence against any of the other defendants. Despite such instructions, however, we held that it was error under *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47

---

[3]The Sixth Amendment in pertinent part provides: ''In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; . . .''

Cal.Rptr. 353, 407 P.2d 265], for the court to have admitted those portions of each confession which implicated a codefendant and that under the circumstances presented the proper procedure would have been to sever and try the defendants separately. (*People* v. *Hill, supra,* 66 Cal.2d at p. 557.) However, we found that "[i]n view of the other competent and overwhelming evidence against both Hill and Saunders," (66 Cal.2d at p. 558) and in light of the vitiating effect of the trial court's instructions, "there is no reasonable probability that the jury would have returned a more favorable verdict for either Hill or Saunders if, as required by *Aranda,* they had been tried separately. [Citations.]" (66 Cal.2d at p. 559.) In sum, we concluded that the error was harmless under state law.

Since our decision on the prior appeals, the United States Supreme Court has decided the case of *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], and has held that the principles announced therein are to be given retroactive operation. (*Roberts* v. *Russell* (1968) 392 U.S. 293, 294 [20 L.Ed.2d 1100, 1102, 88 S.Ct. 1921].) *Bruton* holds that it is a denial of the right to cross-examination, guaranteed to a defendant in a criminal case by the confrontation clause of the Sixth Amendment, to admit at a joint trial an extrajudicial confession of a codefendant which implicates the defendant, despite instructions to the jury to disregard the confession as evidence against the nonconfessing defendant. The court reasoned that, "Despite the concededly clear instructions to the jury to disregard [the codefendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." (391 U.S. at p. 137 [20 L.Ed.2d at p. 485].)

Clearly, in light of our finding of *Aranda* error on petitioners' automatic appeals, the admission of Hill's confession which seriously implicated Saunders, and the admission of Saunders' confession which seriously implicated Hill, constituted error of the type condemned by *Bruton.* Neither Hill nor Saunders took the stand and *Bruton* indicates that despite limiting instructions to the jury as to its use of each confession, it is a deprivation of the Sixth Amendment right to confrontation to admit such confessions at a joint trial.

The admission of Madorid's extrajudicial confession, however, presents a different problem inasmuch as the Attorney General contends that since Madorid took the stand at trial and gave testimony which was consistent with his out-of-court confession, petitioners have "very little to complain about." *Bruton* involved the admission of an extrajudicial confession of a codefendant, Evans, who did not take the stand at the joint trial. The court stated with regard to that fact that, "Plainly, the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand. Petitioner thus was denied his constitutional right of confrontation. [Par.] Not only are the incriminations [of the defendant by the confession of the codefendant] devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination." (391 U.S. at pp. 127-128, 136 [20 L.Ed.2d at pp. 480-481, 485].)

Some courts have taken the position that the above-quoted language indicates that *Bruton* is not intended to apply to the situation where the extrajudicially confessing codefendant takes the stand and is subject to cross-examination. (*Rios-Ramirez* v. *United States* (9th Cir. 1968) 403 F.2d 1016, 1017; *Santoro* v. *United States* (9th Cir. 1968) 402 F.2d 920, 922; *Lipscomb* v. *State of Maryland* (1968) 5 Md.App. 500, 506 [248 A.2d 491, 494].) We do not believe that such is a proper interpretation of *Bruton* in the light of recent right-to-confrontation cases decided by the Supreme Court and by this court. Rather, we think that the admission at a joint trial of an extrajudicial confession of a codefendant which seriously implicates the defendant deprives the latter of his right to confrontation even if the confessing codefendant takes the stand and gives testimony in accordance with his prior confession. However, the testimony so given by the confessing party has a significantly mitigating effect as to any prejudice which might be claimed to result from the admission of the extrajudicial confession.

We find it helpful to examine the problem of "confrontation" in other contexts dealing with both the former testimony and the prior inconsistent statements of a non-party

witness. We begin our discussion with *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]. There the defendant did not have counsel at his preliminary hearing and although he had the opportunity to conduct a cross examination *pro se* of the state's chief witness, he did not do so. At trial the state's witness was absent from the jurisdiction and the prosecution was permitted to read into evidence that witness' testimony given at the preliminary hearing over the defendant's objection that to do so would be a denial of the defendant's right of confrontation. Declaring that the Sixth Amendment right of a criminal defendant to confront the witnesses against him was obligatory upon the states through the Fourteenth Amendment (380 U.S. at p. 403 [13 L.Ed.2d at p. 925]), the court held that Pointer had been denied his constitutional right of confrontation "[b]ecause the transcript of [the witness'] statement offered against petitioner at his trial had not been taken at a time and under circumstances affording petitioner through counsel an *adequate* opportunity to cross-examine" the witness. (Italics added.) (380 U.S. at p. 407 [13 L.Ed.2d at p. 928].) *Pointer* thus held that former testimony could not be admitted against the defendant when he did not have an effective opportunity to cross-examine the hearsay declarant at the time the extrajudicial statement was made. (See also *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074].)

Three years later in *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], the Supreme Court held that even if the defendant's counsel had cross-examined a witness at the preliminary hearing, nevertheless the transcript of such testimony of the witness was inadmissible at the trial on the issue of guilt in the absence of a showing that the witness was actually unavailable to give testimony at trial. The court there stated that "[t]he right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. . . . While there may be some justification for holding that the opportunity for cross-examination of testimony at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case." (390 U.S. at pp. 725-726 [20 L.Ed.2d at p. 260].) The requirement of confrontation was thus extended to preclude the admission of prior testimony despite the fact that the defendant cross-examined the declarant at the time the statement was made, in

he absence of a showing that the witness was actually unavailable so as to bring the former testimony within a recognized exception to the hearsay rule.

Following the above precedents we held in *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] (cert. den. (1969) 393 U.S. 1051 [21 L.Ed.2d 693, 89 S.Ct. 679]), that section 1235 of the Evidence Code was an unconstitutional deprivation of the right of confrontation insofar as it permitted prior inconsistent statements of witnesses to be used substantively in subsequent criminal proceedings. There the complaining witnesses testified before the grand jury that the defendant engaged in incestuous acts with his daughter. At trial, however, these witnesses denied that any incestuous acts had occurred. The prosecutor was then permitted to read into evidence the transcript of the testimony given before the grand jury and the jury was instructed, in accordance with the provisions of section 1235 of the Evidence Code,[4] that they could consider the prior inconsistent statements of the witnesses as substantive evidence. We held that although the defendant had the opportunity to cross-examine the witnesses at the time of trial regarding their prior statements, the admission of those statements as substantive evidence violated the confrontation clause of the Sixth Amendment because the defendant did not have an opportunity to cross-examine witnesses *at the time the prior statements were made.* In short, the cross-examination at trial as to statements made three years earlier was not adequate under constitutional standards.

Recently in *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422], we again adhered to the teachings of *Pointer* and *Barber* in concluding that although the defendant had been accorded an opportunity to cross-examine the witness at the preliminary hearing as well as at the trial, nevertheless the admission at the trial as substantive evidence of the witness' previous inconsistent statements made at the

---

[4]Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or (b) The witness has not been excused from giving further testimony in the action."

preliminary hearing was in violation of the defendant's Sixth Amendment right of confrontation, since they were introduced before a trier of fact different from the one before whom they were made. We there said: "We reiterate that the 'contemporaneous' cross-examination which alone, in the absence of a legal showing of necessity, can be considered fully effective and constitutionally adequate is cross-examination at the *same time* as the direct testimony is given, before the *same trier* as must ultimately pass on the credibility of the witness and the weight of that testimony. In short, cross-examination neither may be *nunc pro tunc* nor may it be *tunc pro nunc*." (Original italics.) (70 Cal.2d at p. 661.)

To summarize, the Sixth Amendment right to confrontation is intended to give to defendants in criminal cases the right to cross-examine as to statements made by the witness *at the time the witness makes those statements, before the same trier of fact which sits on the issue of his guilt* providing that there is no showing of a legal necessity to justify the admission of such statements without cross-examination. As applied to the facts of the instant case, it was error, under our interpretation of *Bruton,* to have admitted Madorid's confession even though he took the stand and testified consistently with his prior extrajudicial statements. The right of cross-examination guaranteed to Hill and Saunders was the right to cross-examine Madorid *at the time he made his confession,* and the opportunity to cross-examine him at the time those prior hearsay statements were admitted at the trial simply was not constitutionally adequate under the above-cited authorities.

The language we have quoted from *Bruton* does not dictate a result different from that which we have reached. Rather, we believe that to interpret such language to remove any constitutional infirmity resulting from the lack of cross-examination at the time Madorid made his statements would do violence to the constitutional principles enunciated by the Supreme Court and by us. The facts of *Bruton* did not require the court to reach the question of what would result if Evans took the stand at trial. Its statements regarding Evans' failure to testify may be viewed as statements of the facts of the case before it and need not be interpreted to mean that Bruton's conviction would have been free of constitutional error had Evans testified. The court did not indicate that if Evans took the stand and was subject to cross-examination that such cross-examination would have been constitutionally adequate. The most that can be drawn from

he court's language is that it felt that cross-examination of Evans was a *minimum* requirement for the admissibility of his confession. We do not read that language as also indicating that such cross-examination would alone have complied with constitutional requirements.

Nor are we persuaded to the contrary by the recent case of *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726]. There each of Harrington's three codefendants confessed and each confession was introduced at their joint trial with limiting instructions. One of the confessing codefendants also took the stand and was cross-examined by the defendant's counsel. The Supreme Court characterized the question before it to be whether the *Bruton* error in the admission of the confessions of the two codefendants who did not take the stand was harmless under *Chapman* v. *California*, (1967 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. However, the court did not deal with the question of whether there was *Bruton* error in the admission of the confession of the co-defendant who did testify. Nothing in the court's opinion indicates that it felt the admission of such confession was not error under *Bruton* and its failure to treat the issue indicates nothing more than that it was not raised by counsel. We do not draw any inferences from *Harrington* which would cause us to hold in the instant case that the admission of Madorid's confession was not error because he took the stand and testified at trial. Until such time as the Supreme Court affirmatively indicates that cross-examination of the confessing codefendant at trial is adequate under the confrontation clause, we feel compelled to hold that the admission of his confession is constitutional error of the type condemned by *Bruton*.

Having determined that it was error under *Bruton* to admit the extrajudicial confessions of each codefendant without effective deletions of references to the other codefendants, we proceed to determine whether the People have proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)

■ We deal first with the prejudicial effect of the admission of Madorid's confession in light of the fact that he also took the stand and testified substantially in accord with the statements made by him in his confession. Although petitioners did not have the right to cross-examine Madorid at the

time he made his confession, we believe that since Madorid's testimony was consistent with his confession and since he was subject to cross-examination at trial by Hill and Saunders the error in admitting his extrajudicial statements was clearly harmless to petitioners beyond a reasonable doubt. If we assume, as *Bruton* tells us we must, that the jury could not obey the court's instructions to disregard Madorid's confession as evidence against Hill and Saunders, nevertheless, the jury was free to consider Madorid's testimony as evidence against petitioners and to convict them on the basis of that testimony if amply corroborated. (Pen. Code, § 1111; see *People* v. *Hill, supra,* 66 Cal.2d at pp. 555-556.) The constitutional infirmity created by the lack of cross-examination of Madorid at the time he made his confession was thus rendered harmless by petitioners' opportunity to cross-examine him at trial with respect to his testimony consistent with his confession.[5] We believe, therefore, that there was no " 'reasonable possibility that the evidence complained of might have contributed to the conviction.' " (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].)

 Nor do we believe that the erroneous admission of Hill's confession implicating Saunders and Saunders' confession implicating Hill was prejudicial to either of them. The evidence against both consisted of the highly incriminating testimony of Madorid which was amply corroborated by Spero's identification of petitioners as the perpetrators of a prior similar crime, by their flight to Las Vegas (see *People* v. *Waller* (1939) 14 Cal.2d 693, 702 [96 P.2d 344]; *People* v. *Murguia* (1936) 6 Cal.2d 190, 192 [57 P.2d 115]), and by the testimony of John Niehoff as to statements made by petitioners during the trip to Las Vegas. However, most persua-

---

[5]We do not intimate that an opportunity to cross-examine a confessing codefendant at trial inevitably renders harmless the admission of his confession implicating the nonconfessing defendant. We can conceive of a situation where the confessing codefendant takes the stand at trial and testifies as to matters not contained in his confession. In that instance the rule limiting cross-examination to the scope of the direct examination (see Evid. Code, §§ 761, 773) may effectively prevent an inquiry into matters contained in the confession. However, when the confessing codefendant testifies as to matters contained in his confession and in a manner consistent therewith then the opportunity to cross-examine him will, in most instances, render the admission of his confession harmless. We caution, however, that we do not approve of the intentional introduction into evidence of the proscribed confessions at a joint trial by a party who hopes that the confessing codefendant's testimony will render the error harmless. Situations may arise where the confession is so prejudicial to the nonconfessing defendant that despite the confessing codefendant's testimony consistent with his confession, the error will not be deemed harmless.

sive to us of the harmless nature of the error was that each confessed to the crime and each confession was properly admitted in evidence against the confessing party. As we have said in another context: "[T]he confession operates as a kind of evidentiary bombshell which shatters the defense." (*People v. Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665].) A "confession . . . constitute[s] persuasive evidence of guilt, . . ." (*People v. Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]) and necessarily has a strong impact on the jury. Since there was no evidence whatsoever in favor of Hill's innocence and only Saunders' initial exculpatory statement as evidence of his innocence the confession of each was evidence which was "merely cumulative" (*People v. Jacobson* (1965) 63 Cal.2d 319, 331 [46 Cal.Rptr. 515, 405 P.2d 555]) of evidence properly admitted against the other. "Where the jury has heard not only a codefendant's confession but the defendant's own confession no such 'devastating' risk attends the lack of confrontation as was thought to be involved in *Bruton*." (*United States* ex rel. *Catanzaro* v. *Mancusi* (2d Cir. 1968) 404 F.2d 296, 300; see *People* v. *Rhodes* (1969) 41 Ill.2d 494, 500 [244 N.E.2d 145, 148].) Because of this unbroken chain of evidence against petitioners and the lack of even one weak link we are convinced that "the likelihood of material influence [of the confessions on the jury] is not within the realm of reasonable possibility." (*People* v. *Coffey* (1967) 67 Cal.2d 204, 220 [60 Cal.Rptr. 457, 430 P.2d 15].) The evidence against petitioners was so overwhelming that we find no prejudice. (See *Harrington* v. *California, supra,* 395 U.S. 250, 254 [23 L.Ed.2d 284, 287, 89 S.Ct. 1726].)

While we find no error of constitutional dimension in the guilt phase of petitoner's trial, as we explain *infra,* there was error in the exclusion of veniremen from petitioners' jury which compels us to order a new penalty trial. For guidance on retrial we here reiterate what we said on petitioners' automatic appeals: Since it appears that deletion of those portions of each defendant's confession implicating his co-defendants would not be effective, on retrial the prosecution either must sever and try the petitioners separately or elect to proceed without the confession evidence if it desires that petitioners be tried jointly. (See *People* v. *Hill, supra,* 66 Cal.2d at pp. 557-558.)

As previously indicated, petitioners contend that veniremen were excluded from the jury in violation of the principles set

forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. Although their trial occurred prior to the decision of the United States Supreme Court in *Witherspoon,* it is clear that they may challenge the jury selection procedures by this collateral proceeding. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 523, fn. 22 [20 L.Ed. 2d at p. 785] ; *In re Anderson* and *Saterfield* (1968) 69 Cal.2d 613, 618 [73 Cal.Rptr. 21, 447 P.2d 117].) We agree that veniremen were erroneously excused for cause and we therefore are compelled to order a new penalty trial.

*Witherspoon* declares that a defendant in a capital case is entitled to a jury which expresses "the conscience of the community on the ultimate question of life or death." (391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) To that end the Supreme Court declared that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U.S. at p. 522 [20 L.Ed.2d at p. 784].) The court held that the only veniremen who could properly be excused for cause because of their opposition to the death penalty were those "who made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." (391 U.S. at p. 522, fn. 21 [20 L.Ed. 2d at p. 785].)

Of the ten prospective jurors and the nine prospective alternate jurors who were excused for cause from petitioners' jury because of their opposition to the death penalty, four were excused when they indicated *only* that they "did not believe in the death penalty."[6] These veniremen did not

[6] "THE COURT: Mrs. Bak, have you heard all that has gone on up to this point?

"MRS. BAK: Yes, sir, I have.

"THE COURT: And how do you feel, do you think you can be a fair and impartial juror in this case?

"MRS. BAK: Sorry, sir, I don't believe in the death penalty.

"MR. FUKUTO [District Attorney]: We will challenge the juror for cause, your Honor.

"MR. LITTLEFIELD [counsel for Hill]: No objection, your Honor.

"MR. BYRON [counsel for Madorid]: No objection, your Honor.

"MR. SHERMAN [counsel for Saunders]: No objection, your Honor.

"THE COURT: Thank you, Mrs. Bak, you may be excused."

"THE COURT: Mrs. Potts, have you heard all that has gone on up to this point?

"MRS. POTTS: Yes, sir.

make it "unmistakably clear" that they would never under any circumstance vote to impose the death penalty. As the Supreme Court said in *Witherspoon* with respect to veniremen who were excused for cause upon indicating that they "did not believe in the death penalty": "It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." (391 U.S. at pp. 514-515, fn. 7 [20 L.Ed.2d at pp. 780-781].) *Witherspoon* therefore would seem to require us to set aside the imposition of the death penalty and order a new penalty trial for petitioners.

However, the Attorney General contends that the jury selection procedures in petitioners' penalty trial met the standards of *Witherspoon*. While he concedes that in some instances the *voir dire* examination of prospective jurors was inadequate, he nevertheless contends that in the context of the entire *voir dire* of all veniremen, taking into consideration

"THE COURT: From what you have heard do you know of any reason why you cannot sit with us as a fair and impartial juror?
"MRS. POTTS: Yes, sir.
"THE COURT: What is that?
"MRS. POTTS: I do not believe in the death penalty.
"MR. FUKUTO: We will challenge the juror for cause, your Honor.
"MR. LITTLEFIELD: No objection, your Honor.
"MR. BYRON: No objection, your Honor.
"MR. SHERMAN: No objection, your Honor.
"THE COURT: You may be excused, Mrs. Potts, thank you."
"THE COURT: Mr. Maurer, have you heard all that has gone on up to this point?
"MR. MAURER: Yes.
"THE COURT: And from what you have heard do you know of any reason why you cannot sit with us as a fair and impartial juror?
"MR. MAURER: Only the death penalty; I don't believe in the death penalty.
"MR. FUKUTO: I will challenge the juror for cause, your Honor.
"MR. BYRON: No objection, your Honor.
"THE COURT: You may be excused; thank you, sir."
"[THE COURT:] Now, from everything that I have said up to this point do you know of any reason why you cannot sit here as a fair and impartial juror?
"MR. McDONALD: I don't believe in the death penalty.
"MR. FUKUTO: We challenge the juror for cause, your Honor.
"MR. BYRON: No objection, your Honor.
"MR. SHERMAN: No objection.
"THE COURT: You may be excused, Mr. McDonald, thank you."
Although the last three of the above four veniremen were prospective alternate veniremen it is clear that petitioners were prejudiced by their dismissal since one alternate juror participated in the deliberations in the penalty phase when one of the regular jurors was relieved of her duty due to a death in her family.

statements made by the court and counsel, "in each instance, no matter what words were articulated, the juror meant to say and was understood by the court and counsel to say, that they opposed the death penalty and would not impose it." His argument is based on the premise that throughout the entire *voir dire* examination both the court and counsel made it clear to the veniremen that much more than general opposition to the death penalty was necessary for them to be excused for cause. From this premise the Attorney General concludes that in those instances where a venireman indicated that he did not believe in the death penalty he was understood to mean that he could never vote to impose that penalty under any circumstances. In support of this conclusion the Attorney General asserts that defense counsel, in the instances set out in footnote 6, *ante*, chose not to interrogate the veniremen who indicated that they did not believe in the death penalty. This, he argues was recognition by defense counsel that such jurors unmistakably indicated that they would never vote to impose the death penalty. He further contends that defense counsel had the power to prevent the erroneous exclusion of venire-men by undertaking further *voir dire* of them and that the failure to do so constituted a waiver of the right to raise such error on review.

 We have recently explained that our task in determining whether a venireman has been properly excused for cause "requires us to assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place." (*People* v. *Varnum* (1969) 70 Cal. 2d 480, 492-493 [75 Cal.Rptr. 161, 450 P.2d 553].) To this extent the Attorney General is correct in his reliance on statements made by the court and counsel during the course of the entire *voir dire* examination. However, we are not here concerned with the interpretation of particular ambiguous words used in a question asked of a prospective juror as we were in *Varnum*. Rather, the Attorney General seeks to apply the *Varnum* approach to transpose a venireman's statement that he does not believe in the death penalty into a statement that he could never vote to impose the death penalty under any

circumstances. We do not believe that *Varnum* may be so applied.

In *Varnum* we looked to the context of the entire *voir dire* to determine that a prospective juror understood that it was completely within her discretion to determine what was a "proper case" for the imposition of the death penalty. Reference to the proceedings prior to her examination was made necessary by the ambiguous nature of the term "proper case." In the instant proceedings, however, we are dealing with a prospective juror's unequivocal statement that he does not believe in the death penalty and the Supreme Court has told us that such a statement, without more, does not give rise to adequate cause for which the venireman may be excused. In the absence of some tangible indication by the venireman that he intends by his answer to state that he could never impose the death penalty, no amount of reference to responses given by other veniremen or to comments by the court or counsel can serve to make certain the meaning of the venireman's response.

The mandate of *Witherspoon* is that "[u]nless *a venireman* states *unambiguously* that *he* would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is *his* position." (Italics added.) (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 516, fn. 9 [20 L.Ed.2d at pp. 781-782].)

The determination is to be made on an individual basis with reference being made to prior *voir dire* only when it is made necessary by the circumstances of the colloquy between the court or counsel and the venireman. When the question put to the venireman is clear and when he responds with an answer free of ambiguity but nevertheless inadequate under *Witherspoon,* then he may not be excused for cause without a further statement *by him* that he could never vote to impose the death penalty. Since such further statements were not elicited from the veniremen in the instant case we are compelled by *Witherspoon* to order that petitioners be given a new penalty trial.

The Attorney General's assertion that petitioners' failure to undertake *voir dire* additional to that undertaken by the court and the district attorney constituted a waiver of their right to complain of the exclusion of veniremen is without merit. We recently stated in *In re Anderson* and *Saterfield, supra,* 69 Cal.2d 613, 618-619: "At the time of petitioners' trials, under decisions interpreting Penal Code

section 1074, subdivision 8, it was proper to excuse for cause prospective jurors who 'did not believe in capital punishment' or who were 'conscientiously opposed to capital punishment' as well as those 'whose consciences would preclude them from imposing [the death penalty].' [Citations.] It is obvious that *Witherspoon* made a material change in the law in this state. Since petitioners were tried before *Witherspoon*, failure to object to the exclusion of the prospective jurors in question does not bar petitioners from now claiming error. [Citations.]'' (See *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 56 [73 Cal.Rptr. 533, 447 P.2d 925].) We cannot assume that counsel would have refused to undertake further examination of veniremen had *Witherspoon* been decided prior to trial. Their failure to do so at this pre-*Witherspoon* trial therefore does not constitute a waiver of the right to raise error in the exclusion of prospective jurors in this collateral attack.

We cannot say, however, that petitioners are correct in their assertion that exclusion from the jury of veniremen opposed to capital punishment deprived them of an unbiased jury representing a valid cross-section of the community on the issue of guilt. As the Supreme Court said in *Witherspoon*: ''We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.'' (391 U.S. at pp. 517-518 [20 L.Ed.2d at p. 782].) There is no evidence in the record before us to substantiate petitioners' contention and we therefore must agree with the Supreme Court that for the present such contention lacks merit.

Petitioners' arguments that the death penalty constitutes cruel and unusual punishment and violates their rights under the Fourteenth Amendment because of the absence of standards governing the jury in its selection of penalties have been considered and rejected by us in *Anderson* and *Saterfield*.

Finally, petitioners' contention that as indigents under sentence of death they are entitled to counsel for post-conviction remedies has also been answered by us in *Anderson* and *Saterfield*. We there indicated that ''as a matter of policy, and upon application of the defendant, we will appoint counsel in such instances.'' (69 Cal.2d at p. 633.) Since we appointed counsel to represent Saunders in these proceedings

upon his application therefor, and since Hill is represented by private counsel, their contention has been rendered moot.

In Crim. 12146 the order to show cause is discharged and the petition for writ of habeas corpus is denied. In Crim. 12125 and Crim. 12007 the writs are granted. The remittitur issued in Crim. 9126, *People* v. *Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908], is recalled and the judgments imposing the death penalty are reversed insofar as they relate to the penalty. In all other respects the judgments are affirmed. Petitioners are remanded to the custody of the Superior Court of Los Angeles County for a new penalty trial.

Traynor, C. J., Peters, J., Tobriner, J., and Mosk, J., concurred.

Burke, J., concurred in the judgments.

McComb, J., Concurring and Dissenting.—I would deny the writs of habeas corpus, deny the recall of the remittitur, and affirm the judgments in their entirety.