[Crim. No. 3112. Second Dist., Div. Two. Oct. 28, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. VERLIA BRUNSON, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**ROTH, P. J.**—Verlia Brunson, in a joint trial with codefendants Jeanne M. Kelly and Hurshel Neal, was found guilty of first degree robbery and kidnaping for the purpose of robbery as were his codefendants. Each defendant was represented by separate counsel and each waived a jury. Brunson was sentenced on April 7, 1938, for the term prescribed by law on the robbery charge and life in prison without possibility of parole for the kidnaping charge, the sentences to run consecutively. Brunson alone perfected an appeal from the judgment.[1] The judgment was affirmed. (*People* v. *Neal* (1938) 27 Cal.App.2d 655 [81 P.2d 593].)

On April 9, 1969, our Supreme Court treated Brunson's petition for a writ of habeas corpus as an application to recall the remittitur in *People* v. *Neal,* 27 Cal.App.2d 655 [81 P.2d 593], and transferred the proceeding to this court with directions to recall the remittitur as to Verlia Brunson, vacate judgment and "determine his appeal in light of *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967] and *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]; *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] and *Roberts* v. *Russell,* 392

---

[1]Defendant Kelly was sentenced to the Institution for Women in Tehachapi on the robbery count for the term prescribed by law and on the kidnaping count for the balance of her natural life with the possibility of parole. These sentences to run concurrently.

Defendant Neal was sentenced to San Quentin on the robbery count for the term prescribed by law and on the kidnaping count for the balance of his natural life with possibility of parole. These sentences to run concurrently.

U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921]; and in the light of the harmless error rule of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]." Accordingly, the remittitur in *People* v. *Neal, supra,* is recalled and the judgment is vacated.

Joe Pearson, the victim of the crimes, parked his car on December 31, 1937, at approximately 11 p.m. opposite the Biltmore Hotel in Los Angeles. He and a female companion drank wine out of a quart bottle on the way to the Biltmore, where they expected to celebrate the advent of the New Year. He had consumed the equivalent of five or six glasses before arrival. At the Biltmore he was offered many drinks but had two scotches. Approximately one hour after having parked his car, feeling indisposed, he returned to it and went to sleep in the back seat. When he recovered consciousness the car was moving and someone was going through his pockets. The someone proved to be Neal who was in the back seat with him. He subsequently discovered that the approximately $5 he had when he went to sleep was gone.

He noted that Brunson was driving the car and Kelly was seated in the passenger seat opposite Brunson. When he attempted to move about, he was knocked "practically unconscious" with a blow from Neal's fist.

At a service station, he heard Brunson telling Kelly how easy it was to snatch cars in the West. About the same time he saw Kelly get out of the car. Pearson next remembered an inquiry from Neal "tell us where we are at," and he told them they were in Westwood. Brunson was telling Neal to slug him as he attempted to move about but he persuaded Neal not to "slug me" and so "Neal gave me a cigarette and apologized." Neal had a knife "and stuck it in my stomach and said, 'All right, if you say anything.' " After Kelly had left the car at the first service station the car again stopped. ". . . It was on the way to Hollywood . . . and I directed them a couple of times on how to get up to Hollywood Boulevard. . . ." The car proceeded east on Hollywood Boulevard and Pearson testified, "So when Brunson turned off . . . I said, 'Well, Vine Street is on down a couple of blocks.' So Neal said, 'We know what we are doing,' so they turned south a block and drove back two blocks to Cherokee and turned north to Hollywood Boulevard and just as they reached the boulevard Kelly was standing over on the curb and she came out and Brunson opened the door and she acted rather excited and said, 'What's happened,' he said, 'Nothing. Get in.' So she got in the car" and it proceeded east on Hollywood Boulevard.

"Q. Where to?

"A. It was beyond Vermont a few blocks.

"Q. What happened while you were going there?

"A. I said, 'The car isn't mine.' I said, 'What are you going to do with it." They said, 'We only want the car for a few hours.' I said, 'If you only

want the car for a few hours let me go along with you.' I thought I would get a chance—

".     .     .     .     .     .     .     .     .     .     .     .

"A. A few blocks the other side of Vermont they said they were going to let me out.

"Q. Who said that?

"A. Neal, and he said the car is insured by the Auto Club of Southern California, isn't it? And I wasn't sure whether it was or not. I said, 'I think so.' He said, 'All right, we will leave the car down on Figueroa Street by the Auto Club of Southern California. We are going to give you carfare home and we have your name and address and know all about you and if you report this or anything, why it is just too bad for you,' so they stopped and Kelly got change for a dollar bill and they gave me a quarter and drove back up Hollywood Boulevard three blocks west and then they turned off and went several blocks north and let me out of the car." According to Pearson he left the car at approximately 4:30 and walked to his home.

On January 2, 1938, a car in which the three named defendants were riding, was stopped by the police in Santa Maria. At the trial Brunson testified and produced witnesses who testified at length and in detail to an alibi. The witnesses were in no way related to Brunson, and their testimony shows that never before the events which they testified to had they seen or met Brunson. The alibi, however, was a question of fact, and it was rejected by the court.

Kelly did not take the stand, but placed Brunson and Neal in the car at the time of the robbery and kidnaping in an extrajudicial statement she made to an officer in the presence of and within hearing of Brunson and Neal. The use by the prosecution of this and several other extrajudicial statements of Kelly and Neal are the second reason the case is now before this court.

Neal, in his testimony, although he admits meeting Brunson and Kelly in the afternoon of New Year's Day, denied being in the car in the morning of New Year's Day when Pearson was kidnaped and robbed. There can be little doubt from Pearson's testimony on which he was cross-examined by three separate defense counsel that there were two men and a girl in the car at the time he was kidnaped and robbed.

### Lineup Identification

Several days after the arrest in Santa Maria, Brunson and Neal first appeared in a lineup with 20 to 30 other persons and immediately thereafter by themselves.

At the time they were arrested in Santa Maria and at the time they appeared in the lineup, Brunson and Neal were wearing different colored clothes from those previously described by Pearson to the police. However, Pearson testified on direct that he "more or less" recognized Brunson and Neal in the first lineup. During cross-examination, Pearson testified, "Sure I recognized them." On cross-examination, defense counsel attempted to show that Pearson was in a dazed condition throughout the ride in the auto. A fair summary of this cross-examination is shown by the following questions and answers: "Q. And you were pretty much dazed from that time until you got out of the car? A. No, on the way back at the time Neal was holding a knife in my stomach everything was very clear then. . . . A. And you also stated that you were lying on your right side by that automobile and it was from that position that you observed Brunson? A. No, coming back I was sitting up in the front seat. I observed him from the sitting up angle."

Cross-examination in respect of the attire of Brunson and Neal was as follows: "Q. And isn't it also a fact that you didn't recognize Brunson at that time from the twenty in the lineup? A. He had on different clothes when they brought all of them out. Q. As a matter of fact you didn't recognize him until Neal and Brunson were brought in the second time alone, together, isn't that a fact? A. Well, indirectly. A lot of people in a room will still be maybe a little doubt in your mind. Q. You didn't definitely recognize Brunson in your mind then until the two were brought out together? A. I wouldn't say that. I more or less recognized him. Q. As a matter of fact you weren't sure that Brunson was the fellow who was driving that car at all? A. You say I wasn't? Q. You weren't positive and aren't now positive that that was Brunson, the gentleman here that was driving the car? A. Yes, I am."

Appellant contends that this identification procedure deprived him of due process under the doctrine of *Stovall* and *Caruso*.

The appeal from this 1938 conviction does not, of course, involve the constitutional requirements for identification procedures announced in *United States* v. *Wade,* 338 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], since those requirements were made non-retroactive. (*Stovall* v. *Denno,* 388 U.S. 293, 296 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967].) However, the *Stovall* opinion made clear that a confrontation or identification may still be challenged if it "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [appellant] was denied due process of law." (*Stovall* v. *Denno,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *Foster* v. *California,* 394 U.S. 440, 442 [22 L.Ed.2d 402,

406, 89 S.Ct. 1127]; *People* v. *Caruso,* 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336].)

In *In re Hill,* 71 Cal.2d 997, the court says at page 1004 [80 Cal.Rptr. 537, 458 P.2d 449]: "The watchword of due process of law is fundamental fairness and it has been said that in the matter of identification gross unfairness often results from 'the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.' *(United States* v. *Wade, supra,* 388 U.S. at p. 288 [18 L.Ed.2d at p. 1158]; see *People* v. *Caruso, supra,* 68 Cal.2d at p. 188.) One of the most condemned pretrial identification procedures is that of showing a suspect alone to witnesses to a crime as was done in *Stovall.* 'It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police.' *(United States* v. *Wade, supra,* 388 U.S. at p. 234 [18 L.Ed.2d at p. 1161].) We must thus initially determine whether the method used by the police to present petitioners to Spero was unduly suggestive within the rule of *Stovall* keeping in mind the caveat that 'a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, . . .' *(Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at p. 1206].)"

Pearson had testified to conversations he heard between Brunson and Kelly before Kelly left the car at the first service station and after, when Kelly was picked up in Hollywood. He testified to conversations between Brunson and Neal throughout the ride which, according to his testimony, consumed approximately four hours. The car stopped at the first service station to let Kelly out. Later, it stopped at a service station for gas. Pearson advised Brunson and Neal in answer to Neal's inquiry as to their whereabouts that they were in Westwood. He directed Brunson and Neal how to get to Hollywood. He tells how Neal apologized for slugging him and gave him a cigarette. Although somewhat dazed when he first awoke and after he was slugged by Neal, he testified clearly to the streets in Hollywood and the place where they picked up Kelly; how the car proceeded after Kelly was picked up; the fact that a stop was made so Kelly could get change for a dollar. He was given 25 cents for carfare. He also narrates the discussion in which he was told how he could recover his automobile.

■ There is nothing in the totality of circumstances before us to indicate that the police in the lineup procedure did anything unfair or grossly unfair or at any time made a suggestion of any kind to Pearson prior to or at any stage of the lineup procedure. To the contrary, the record shows that the police when they asked Pearson to attend a lineup with 20 to 30 others in it, had no intention of being at all suggestive. Giving Brunson

the benefit of every doubt, the dual showing indicates only that Pearson or the police, at whose suggestion the record does not show, in order to be positive, proceeded with the second confrontation. In the circumstances of this case, we believe that the evidence clearly and convincingly shows that Pearson had more than adequate opportunity to observe defendants during a four-hour car ride and that he properly identified Brunson and Neal without any suggestion, direct or indirect, from the police.

Further, there was at bench a definite in-court identification. The record does not show, even remotely, whether it was independent of the lineup procedure or based upon it. Presumably it was independent.

In our opinion, there is no evidence of suggestive identification procedures in the record which was prejudicial and which requires reversal. The facts here are quite different from those passed on in *Caruso*.

### EXTRAJUDICIAL STATEMENT

In *Bruton* v. *United States,* 391 U.S. 123, 128 [20 L.Ed.2d 476, 480, 88 S.Ct. 1620], the court held that the admission of a codefendant's extrajudicial statements into evidence is a violation of the Sixth Amendment constitutional right to confrontation.

*Bruton* was held retroactive in *Roberts* v. *Russell,* 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921] because ". . . the constitutional error presents a serious risk that the issue of guilt or innocence may not have been reliably determined," 392 U.S. 293, 295 [20 L.Ed.2d 1100, 1103].

At bench there is *Bruton* error and it was highly prejudicial.

Officer Pollard testified that when defendants were stopped in Santa Maria, Kelly said she was a hitchhiker and that she understood the car was Brunson's.

Officer Christopher, who drove the three defendants to Los Angeles on January 3d, testified he had a conversation with Kelly who was in the front seat beside him. He told her she was charged with a serious offense and that she might as well help herself.

"A. She said, 'What do you want me to tell you about?' I said, 'Well, from the first of this case right on through.' She said, 'Well, when we got in the car we didn't realize there was anybody in the car,' I said, 'Just a minute; when did you first bring up the question of getting the car, and get together?' She said it was two nights prior in Pershing Square, that she had met Brunson; that they had talked over the proposition of getting a car and going to San Francisco and making some money; that if there was an arrest made there was nothing to fear, that he could take the rap, because he was already wanted and owed twenty-seven months and wouldn't get anymore for another crime out here than he would for what he had. She said they met

once and talked the proposition over and the next night they met and walked up the street and that they drove out some distance before they knew there was a passenger in the automobile. She said when she seen what the boys were doing she asked to get out of the car and let her get out of the car at a service station and agreed to come back and pick her up. She got out and in about 30 minutes they came back and picked her up at an intersection; drove over and let the man out and drove to different parts of town; she didn't know just where it was because she wasn't well acquainted, and that later they started to drive to San Jose and she would have to hitch hike from there to San Francisco where she was wanting to go. I asked her how much money they got. She said it didn't amount to much, two or three dollars, and that was spent for gasoline. Q. Did the defendant Brunson or Neal make any statement after she made that statement? A. None to me. Q. Did you have any further conversation with her on the way down? A. I had a conversation with her on the way to the Lincoln Heights Jail when she was alone, and she substantiated the story she had told me the first time."

Officer Christopher's testimony to the extrajudicial statement of Kelly during the ride to Los Angeles was not limited to Kelly. The statement was received not only as substantive evidence against Kelly which was proper, but also against Brunson.

The statement could scarcely be characterized as an accusation against Brunson which he should have been expected to deny, even if it be argued that he heard it. At most it was an accusatory statement. ". . . and the fact of his silence . . . [would have been admissible in evidence against him], *not as substantive evidence in proof of the facts asserted in the accusation, but merely to show the accused's reactions.*" (Italics added.) (19 Cal.Jur. 2d (Rev.) Evidence § 494, p. 252.)

In the *Hill* case, the court, speaking of such extrajudicial statements, says at page 1008: "Since our decision on the prior appeals, the United States Supreme Court has decided the case of *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], and has held that the principles announced therein are to be given retroactive operation. (*Roberts* v. *Russell* (1968) 392 U.S. 293, 294 [20 L.Ed.2d 1100, 1102, 88 S.Ct. 1921].) *Bruton* holds that it is a denial of the right to cross-examination, guaranteed to a defendant in a criminal case by the confrontation clause of the Sixth Amendment, to admit at a joint trial an extrajudicial confession of a codefendant which implicates the defendant, despite instructions to the jury to disregard the confession as evidence against the nonconfessing defendant. The court reasoned that, 'Despite the concededly clear instructions to the jury to disregard [the codefendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial

we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.' (391 U.S. at p. 137 [20 L.Ed.2d at p. 485].)"

Officer Dixon testified that he conversed with Kelly at the Lincoln Heights jail. At that time, she related that she had met Brunson two or three days earlier and discussed going to San Francisco and that appellant said they would get a car. Later, Brunson directed her and Neal to take a walk and shortly thereafter drove up with the car. This conversation also included statements relating to someone else being in the car, driving around, getting out of the car for 20 or 30 minutes, and giving the man a quarter. This testimony was limited to Kelly. No objection was made thereto. ■ However, although an objection must be made in a post-*Aranda* trial, in a pre-*Aranda* trial, no objection could have been successfully interposed to a statement or confession limited to a confessing defendant, nor could the validity of one be reasonably anticipated. An accused subjected to such procedure in a pre-*Aranda* trial may obtain review thereof directly under *Aranda,* if the judgment against him has not become final and retroactively under *Bruton.* ■ These statements, too, were prejudicial. *Bruton, supra,* holds ". . . we cannot accept limiting instructions as an adequate substitute to [the] constitutional right of cross-examination."

Appellant's trial was not a miscarriage of justice. At his trial, appellant was afforded his full constitutional rights as such rights were interpreted by the courts prior to *Bruton* and *Hill.* ■ However, these cases make retroactive the prohibition against receiving in evidence at a joint trial the unedited confessions of one codefendant, even though accompanied by proper limiting instructions. ■ We are unable to declare that beyond all reasonable doubt the court's judgment in the instant case was not affected by the receipt of Kelly's and Neal's extrajudicial confessions, implicating appellant in the robbery-kidnaping, of which they were jointly accused.

The judgment is reversed.

Fleming, J., and Wright, J., concurred.

A petition for a rehearing was denied November 19, 1969.